SUPREME COURT OF nIE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

X

In the Matter

-of-

The interception of Certain Telephonic and Electronic
Communications Occurring Over the Cellular Telephone
Line and Instrument CUITently Assigned Te]ephone
Number (9]4) 443-8]82, with electronic serial number
17904462477, subscribed in the name of Anthony
Colombo and biHed to Philip Dioguardi at 2 East Main
Street, Number 4, Town of Middletown, County of Orange,
State of NewY ork;

AFFIDAVIT IN
SUPPORT OF AN
APPLICATION FOR
AN EXTENDED
EAVESDROPPING
WARRANT

X

AND

The Interception of Certain Telephonic and Electronic
Communications Occurring Over theTelephone Line and
Instrument Currently Assigned Telepbone Number
(914) 496-6506, listed to Lucille Colombo and located
at 51 Horton Road, Village ofWashingtonville, Town of
B]ooming Grove, County of Orange, State of New Y ork~

X

AND

The Interception of Certain Telephonic and Electronic
Communications Occurring Over theTelephone Line and
Instrument Currently Assigned Te]ephone Number
(914) 343-3313, listed to Philip Dioguardi and located
at 2 East Main Street, Number 4, Town of Middletown,
County of Orange, State of New York.

X

STATE OF NEW YORK )
                    ) ss:
COUNTY OF WESTCHESTER)

JOSEPH McCABE, being duly sworn, deposes and says:

1. I am an Investiga.tor with the New Yark State Police (hereinafter "NYSP"),

assigned to the Special Investigations Unit ("SIU') at the New York State Organized Crime Task

Force (hereinafter "OCTF'V An on-going investigation being conducted by OCTF and the NYSP has revealed probable cause to believe that Christopher Colombo, Anthony Colombo, Philip Dioguardi, John Ferrara, their agents, co-conspirators and others as yet unknown are engaged in, and continue to engage in, the crimes of Promoting Gambling in the First and Second Degrees, Possession of Gambling Records in the First and Second Degrees and Conspiracy to commit those crimes in violation of Articles 225 and 105 of the Penal Law of the State of New York.

2. Our investigation has also established probable cause to believe that the above-captioned telephone lines and instruments have been and will continue to be used to discuss and engage in those crimes. Consequently, this affidavit is submitted in support of !he Application by George B.Quinlan, Deputy Attorney General In-Charge ofthe Organized Crime Task Force, for an Eavesdropping Warrant authorizing the continued interception and recording of certain telephonic and electronic communications occurring over the telephone lines and instruments currently assigned the following telephone numbers: (914) 443-8182, bearing electronic serial number 17904462477, subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2 East Main Street, Number 4, Town of Middletown, County of Orange, State of New York; (914) 496-6506, subscribed in the name of Lucille Colombo and located at 51 Horton Road, Village of Washingtonville, Town of Blooming Grove, County of Orange, State of New York; and (914) 343-

---

My experience has been detailed in my affidavit, sworn to on August 8, 2000, and submitted in support of an eavesdropping warrant on the above-captioned telephone lines and instruments. This WaIrant, and the affidavits and application submitted in support thereof, is on file with the Court and incorporated herein.

2

3313, subscribed in the name of Phi]ip Dioguardi and located at 2 East Main Street, Number 4, Town of

Middletown, County of Orange, State of New York.2

3. Unless otherwise indicated, the facts set forth in this affidavit are based upon my own

observations and knowledge, upon my examination of the investigative reports prepared by OCfF and the

NYSP, upon my conversations with members of OCTF, other members of the NYSP and a confidential

infonnant, and upon my review of eavesdropping warrant data, telephone ton records and pen register and trap

and trace device data.

4. All dates and times referred to herein are approximate. Furthennore, unless otherwise noted,

where statements of other individuals are described, tbose descriptions are intended to cOnvey the sum and

substance of such statements, and are not necessarily exact quotes. This affidavit is submitted for the sole

purpose of supporting an application to continue to conduct electronic surveiUance. Consequently, not every

detail or aspect of our ongoing investigation has been noted herein.

5. Based upon the facts developed during this investigation, on May 1,2000, the Honorable

Daniel W. Joy, Justice of the Supreme Court of the State of New York, Appe1Jate Division, Second

Department, issued an Order for Pen Registers and Trap and Trace Devices authorizing the installation and use

of pen registers and trap and trace devices (CaBer ill) on the

---

[2] Subject John Feuara's home telephone and celIular telephone are located within
the geographical jurisdiction of the Supreme Court of the State of New York, Appellate Division,
First Deparbnent. An application for an extended and amended eavesdropping warrant on the
Ferrara telephone lines is being submitted on this date to the First Department. The facts
supporting the application for both eavesdropping wauants is the same. There is no request in
this application to continue interception over the Anthony Colombo home telephone.

telephone lines and instruments assigned the following telephone numbers: (914) 443-8182, bearing electmnic serial number 17904462477, subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2 East Main Street, Number 4, Town of Middletown, County of Orange, State of New York; (914) 496-6506, subscribed in the name ofLuciIJe Colombo and located at 51 Horton Road, Town ofWashingtonviUe, County of Orange, State of New York; (914) 496- 8201, subscribed in the name of Anthony Colombo and located at 25 Horton Road, Town of Blooming Grove, County of Orange, State of New York; (914) 343-3313, subscribed in the name of Philip Dioguardi and located at 2 East Main Street, Number 4, Town of Middletown, County of Orange, State of New York; and (917) 560-0397, bearing electronic serial number 316010009486930, subscribed in the name of Jeffrey Rosen, 1444 11th Street, Fort Lee, New Jersey.

6. Furthermore, on June 15,2000, the Honorable Eugene Nardelli, Justice of the Supreme Court of the State of New York, Appe]]ate Division, First Department, issued an Order for a Pen Register and Trap and Trace Device authorizing the installation and use of a pen register and trap and trace device (Caller J.D.) on the telephone line and instrument assigned telephone number (212) 410-7444, subscribed in the name ofTberesa Ferrara and located at 420 East 115th Street, 3rd floor, apartment 3, County of New York, State of New York.

7. On June 29, 2000, the Honorable Sondra Miller, Justice of the Supreme Court of the State of New Y OTk, Appellate Division, Second Department, issued an Order Extending the use of Pen Registers and Trap and Trace Devices on the telephone lines and instruments assigned the following telephone numbers: (914) 443-8182, bearing electronic serial number 17904462477, subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2 East Main

Street, Nmnber4, Town of Middletown, County of Orange, State of New York; (914) 496-6506, subscribed in the name of Lucille Colombo and located at 51 Horton Road, Town of WashingtonvilJe, County of Orange, State of New York; (914) 496-820], subscribed in the name of Anthony Colombo and located at 25 Horton Road, Town ofB]ooming Grove, County of Grange, State of New York; and (914) 343-3313, subscribed in the name of Philip Dioguardi and located at 2 East Main Street, Number 4, Town ofMidd]etown, County of Orange, State of New York.

8. On August 9,2000, the Honorab]e Danie] Luciano, Justice of the Appellate Division, Second Department, signed an Eavesdropping Warrant authorizing the interception of

certam telephonic and electronic communications occurring over the above-captioned telephone lines and instruments currently assigned the fonowing telephone numbers; (9 14) 443-8 182, bearing electronic serial number 17904462477, subscribed in the name of Anthony Colombo and billed to Philip Dioguardi at 2 East Main Street, Number 4, Town ofMidd]etown, County of Orange, State of New York (the "Dioguardi cell phone"); (914) 496-6506, listed to Luci11e Colombo and located at 51 Horton Road, Town of Washingtonvi11e, County of Grange, State of New York (the "Christopher Colombo home phone"); (914) 496-8201, listed to Anthony Colombo and located at 25 Horton Road, Town of Blooming Grove, County of Grange, State of New York (the "Anthony Colombo home phone"); and (914) 343-3313, listed to Philip Dioguardi and located at 2 East Main Street, Number 4, Town of Middletown, County of Grange, State of New York (the "Dioguardi home phone"). That Order was based upon the application of George B. Quinlan, Deputy Attorney Genera]-In-Charge of the Organized Crime Task Force, sworn to on August 8, 2000. This

application and the affidavits submitted in support thereof, along with Justice Luciano's Orders, is on file with the Court and is incorporated herein by reference and made part of this application.

9. Additionally, on August 9, 2000, the Honorable David Friedman, Justice of the Appellate Division, First Department, signed an Eavesdropping Warrant authorizing the interception of certain telephonic and electronic communications occurring over the telephone line and instrument currently assigned telephone number (212) 410-7444, listed to Theresa Ferrara and located at 420 East 115th Street, 3rd floor, apartment 3, County of New York, State of New York (the "Ferrara home phone"). That Order was based upon the appJication of George B. Quinlan, Deputy Attorney General-In-Charge of the Organized Crime Task Force, sworn to on August 8, 2000. This application and the affidavits in support thereof, was predicated upon the same facts as the Eavesdropping Warrant mentioned immediately above for the above-captioned teJephone lines and instnnnents currently assigned telephone numbers (914) 443-8182, (914) 496-6506, (914) 496-8201, and (914) 343-3313.

10. On August **11,2000,** the Honorable David Friedman, Justice ofthe Appellate Division, First Department, signed an Order granting the continued attachment, installation, and use ofa pen register and trap and trace (Caller ID) device on the telephone line and instrument currently assigned telephone number (212) 410-7444. That Order was based upon my affidavit, sworn to on August 11,2000. This prior application, along with Justice Friedman's'Orders, is on file with the Court and is incorporated herein by reference and made part of this application.

11. On August 23, 2000, the Honorable Howard Miller, Justice of the AppelIate Division, Second Department, signed an Order granting the continued attachment, installation, and

use of pen registers and trap and trace (Caner m) devices on an Order Extending the use of Pen Registers and Trap and Trace Devices on the telephone lines and instruments assigned the following telephone numbers: (9l4) 443-8182, bearing electronic serial number 17904462477, subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2 East Main Street, Number 4. Town of Middletown, County of Orange, State of New York; (914) 496-6506, subscribed in the name ofLucme Colombo and located at 51 Horton Road, Town ofWashingtonville, County of Orange, State of New York; (914) 496-8201, subscribed in the name of Anthony Colombo and located at 25 Horton Road, Town of Blooming Grove, County of Orange, State of New York; and (9l4) 343-3313, subscribed in the name ofPhiJip Dioguardi and located at 2 East Main Street, Number 4, Town of Middletown, County of Orange, State of New York.

12. For the purpose of the instant Application, I incorporate herein by reference the May 1,2000 Order for Pen Registers and Trap and Trace Devices, the June15, 2000, Order for a Pen Register and Trap and Trace Device, the June 29, 2000, August 11, 2000, and August 23, 2000, Pen Register Extension Orders, the August 9,2000, Eavesdropping Warrants, and all affidavits submitted in support of their issuance as if they were fully set forth at length below.

<u>SUMMARY OF THE INVESTIGATION</u>

13. Since October, 1999, members of the Organized Crime Task Force and the New York State Police ("the investigative team") have been investigating information received from the Orange County District Attorney's Office regarding an illegal gambling operation being conducted by Christopher Colombo and others in Orange County and elsewhere within the State of New York.

14. During the course of the investigation the team was informed by Joseph Rauchet,[3] Deputy Chief Investigator of the Organized Crime Task Force that Christopher Colombo and Anthony Colombo are two of the sons of the late "boss" of the Colombo organized crime family (or "mafia"), Joseph Colombo, Senior.

15. Beginning in October, ] 999, the investigative team observed Philip Dioguardi frequently in the vicinity of First Avenue and] 15th Street, New York County, meeting with John Ferrara, also known as John Berlingieri. The team also observed Ferrara entering and leaving the "Mary Peters" gambling wireroom, located at 333 East 116th Street, several times during a two hour period.

16. While conducting surveillance in the viciruty of 115th Street and First Avenue, New York County, the investigative team has also observed Christopher Colombo, Philip Dioguardi, and Anthony Colombo meeting together and separately with convicted gamblers Gaetana Cirillo, Robert Milano, Rinaldo Nistico, Anthony DeFranco, and Genovese organiZed crime family soldier Daniel Pagano.[4] The investigative team also conducted surveillance at the residences of the

---

[3] Deputy Chief Investigator Rauchet's experience, as well as his explanation of organized crime-related terms, has been detailed in my affidavit, sworn to on August 8, 2000, and submitted in support of an eavesdropping warrant on the above-captioned telephone lines and instruments. This warrant, and the affidavits and application submitted in support thereof, is on file with the Court and incorporated herein.

[4] For more details regarding the criminal records of these individuals. see the affidavits in support of the applications for pen registers and trap and trace devices. dated May 1. 2000, and June 15.2000.

above-mentioned targets. This frequent surveillance revealed that PlUlip Dioguardi was at the home of Christopher Colombo and Anthony Colombo numerous times a week.

17. In the first months of this year, the investigative team obtained telephone toU records of the targets of this investigation. This analysis revealed that the targets of this investigation were in constant telephonic contact with one another during this period.s The telephone records also revealed that the targets of this investigation used the target telephone lines to contact convicted bookmakers and gamblers, as well as numerous businesses known to the investigation as gambling wirerooms and policy lay-off rooms.

18. As a result of information gained ftom the team's investigation, the above- mentioned May 1,2000, and June 15,2000, pen register orders were signed. An analysis of pen register data compiled from these two pen registers revealed that the above-mentioned ftequent and consistent telephone contact between the targets of this investigation over the above-mentioned target telephone lines continued. The pen register data also revealed that the targets of the investigation were in telephonic contact with convicted bookmakers, illegal gambling and policy rooms, and members of organized crime as identified by the Federal Bureau of Investigation.

Moreover, surveiUance conducted by the investigative team revealed that the targets of the investigation were still meeting with each other on a routine basis both in Orange and New York Counties in furtherance of the criminal enterprise.

_____s For a more detailed discussion of these telephone records, see the above-mentioned incorporated pen register applications, and the affidavits submitted in support thereof, dated May 1, 200O, J1ll1e 15,2000, June 29, 2000, August **11,** 2000, and August 25, 2000.

19. Additionally, during this period, the investigative team developed a confidential informant who recorded gambling-related conversations with a bookmaker responsible for a "sheet" of gamblers. Information iTom the informant, corroborated by an analysis of telephone toll records and information from the Orange County District Attorney's Office, revealed that Christopher Colombo was in charge of the gambling operation.

20. As a resuJt, the above-mentioned pen register orders were extended on June 29,20006, and August 11,2000, respectively. Since these dates, the above-mentioned frequent and consistent telephonic contact among and between the targets of the investigation has continued. Moreover, contact betweei1 the targets and convicted bookmakers, illegal gambling and policy rooms, and members of organized crime has also continued. The investigative team also continued to conduct surveillance which revealed Philip Dioguardi continuing to meet John Ferrara in the vicinity of 1 15th Street and First Avenue, New York County, and Dioguardi continuing to go to Christopher and/or Anthony Colombo's homes in the mornings for a few hours each day.

## mE CURRENT INVESTIGATION

21. On August 9, 2000, as noted above, two eavesdropping warrants were signed, authorizing the interception of telephonic and electronic communications over the folJowing telephone lines and instruments: the Christopher Colombo home phone, (914) 496-6506; the Anthony Colombo home phone, (914) 496-8201; the Philip Dioguardi cell phone, (914) 443-8182; the Philip Dioguardi home phone, (914) 343-3313; and the John Ferrara home phone, (212) 410-

---

[6]    This pen register order was further extended on August 25. 2000.

7444. During the authorized period of interception beginning August 9, 2000, the team has intercepted conversations over these telephone lines and instruments which demonstrate that Christopher Colombo, Anthony Colombo, PhiJip Dioguardi, John Ferrara, their accomplices, co- conspirators, agents, and others as yet unknown, are continuing to participate in a gambling enterprise. An example of these conversations is listed below.

22. On August 11,2000, at approximately 5: 10 p.m., Dioguardi caned7 the Ferrara home phone from his home phone. Dioguardi spoke to a woman who answered the Ferrara phone and asked her "where's John?" She told him "he *went* to the Bronx." Dioguardi said, "ob, he must be early," hung up, and immediately dialed the telephone line and instrument currently assigned telephone number (917) 723-3915,8 and spoke to Ferrara who answered the phone. Dioguardi asked Ferrara about "the bill" and Ferrara replied that Bob said he would "pay half' and that Joe thought the "Con Edison bill was too high" at $128. Ferrara told Dioguardi that Joe said he "didn't want to pay nothing until I checked." The two discussed telling "the other guy" that the bill was $60 or that the guy owes half of $128. Dioguardi said "wait 'til we get the phone bill." This call reveals, in

---

7 This outgoing call was recorded over the Dioguardi home phone as call number 010 on our monitoring equipment. This call was also recorded as incoming can number 019 over the Ferrara home phone on our monitoring equipment.

8 A check with Sprint Spectrum revealed that this cellular telephone number, bearing electronic serial number 24701129589, is listed to John Berlingieri at 420 East 115th Street, 3rd floor, New York County. This phone was activated on June 24, 2000. Berlingieri's date of birth as listed on the telephone account is the same as that listed for John Ferrara on his expired driver's license. As described below, it is my opinion that Berlingieri and Ferrara are the same person. This cellular telephone number is the subject of an application for an Eavesdropping Warrant presented to the Appellate Division, FiTst Department, this date.

my opinion, that the new gambling wireroom is in the Bronx and that Ferrara goes there, as he went to the original wireroom discovered in the investigation. In addition, this call shows that Dioguardi is responsible for wireroom bills for electricity and telephone service and that he and Ferrara deal with the day to day operation of this new wireroom.

23. Dioguardi spoke to Ferrara later that day as wen. In this conversation, the two discussed the "600's" and the "2215 plus 1660 figure." Dioguardi asked Ferrara "This is Joe's sheet, how much he give us today?" Ferrara replied, "Joe's got to give you $18,200. We got to give them $1922. I got to give Skinny $185. I only took down 612. Ant's figure and Skinny's. sat gave us $2510." In my opinion, this call refers to Ferrara's position in the gambling organization of having to report to Dioguardi each bookie's figures, ie, amount bet and owed.

24. At 5:30 p.m., that same day, Dioguardi received a caW~ from Christopher Colombo who complained to Dioguardi "what does he want from me, Philly . . . he wants to put me in the middle. . . wants me to go after him. . .he ain't gonna pay the money, Philly." Dioguardi advised Christopher to "speak to the kids mother." Christopher told Dioguardi "I already spoke to her too." Christopher stated, "I told him two weeks ago they were ignoring my phone calls." He further told Dioguardi that he is going "to caH him back and tell him. . . you're responsible, Joe" and that "it came out that the kid did it twice already- Would you give him the number, Philly?" This call reveals, in my opinion, that Christopher is angry that Joe, his brother, wants him to collect

---

[9] This incoming call was recorded over the Dioguardi home phone as call number 012 on our monitoring equipment.

money from a gambler who was given the number to a wireroom to bet after he had not paid his debts. This call also shows that Joe is in charge of the gambling operation.

25. Several hours later, at approximately 8:26 p.m., Dioguardi called IO Ferrara and told him, "meet me at 12:00 . . . in Jersey. .. and give me an the work that we have" as wen as "the tapes and balances." Fen-ara told Dioguardi, "I need a tape" and Dioguardi assured him that he would give him enough tapes to last. The tenns "work," "tapes," and "balances" are used, in my experience, in gambling operations *as* follows: "work" is a tenn used to denote all of the gambling "sheets" and other papers used to record bets; "tapes" are cassette tlpes used to record all telephone calls so that a bettor can not dispute a losing bet at a later time; and "balances" is a tenn used to denote each bettor's current financial status, whether the gambling organization owes the bettor money or is owed.

26. On August 12,2000, at approximately I :39 p.m., Anthony ColOIpbo received an incoming caJll1 from the telephone line and instrument currently assigned telephone number (212) 381-5671, from a maJe wbo referred to Anthony as "dad." Anthony asked his son ifbe "picked up the checks" and the male responded "yea, but there was no check in there for you." Anthony then told his son, "there's never a check for me. . It's for your mother." The son stated that he "was not

---

10    This outgoing can was recorded over the Dioguardi home phone as call number 018 on our monitoring equipment.

J I This incoming call over the Anthony Colombo home telephone was recorded as caIl number 078 on Our monitoring equipment.

Anthony told his son that he was "going to call up lcidding" and that he" got mine and I got JJ's."

John."

27. Anthony immediately dialedl2 the telephone line and instrument currently assigned telephone number (917) 337-5357 and left a message on an answering machine which stated that a message could be left for John Contino. Anthony left a message asking John to call him at home or on his cell phone. Less than thirty minutes later, Anthony received a telephone cal113 from the telephone number (917) 337-5357, from a male who identified himself as "John." Anthony asked John ifhe "left a check for Caro]." John replied that "there's cash in Carol's envelope, too. So that's why they probably didn't want to give it to him. I don't know who picked them up." Anthony said, "1 don't think it was n, because 11 worked in Brooklyn so he couldn't pick the checks up. That figures, now." John told Anthony that on Monday he will "bring it to ]J during the day." Anthony said that was good and that he '~ust wanted to make sure that there was no problem." I am informed by Deputy ChiefInvestigator Joseph Rauchet that these caIls reveal, in his opinion, that members of the Colombo family are being paid by check for jobs which they do not do. The use of a business payroll to pay for individuals who do not work is, in my opinion, a method by which a business 9wner can pay-off the "mafia" without attracting any attention. This opinion is bolstered by the fact that the checks are never in Anthony's name as he is tryjng to avoid law enforcement.

---

[12] This outgoing call over the Anthony Colombo home phone was recorded as call number 079 on our monitoring equipment.

13 This incoming call was recorded over the Anthony Colombo home phone as call number 082 on our monitoring equipment.

28. Later that day, at approximately 5: 18 p.m., Christopher Colombo caIledJ4 the telephone line and instrument currently assigned telephone number (914) 755-2674, ftom his home phone, and spoke to a male he caned "Jerry." Colombo told Jerry that "Louie just ca1led me and said you *(Jerry)* never gave him back the check:' Jerry told Colombo that he "dropped the check at the other store" and that he was "not delivering the check to Louie:' Colombo hung up the phone and immediately dialedl5 the telephone line and instrument currently assigned telephone nwnber (914) 755-2654. When be got a recording ftom Nextel stating tbat the customer was out of range, he dialed16 the telephone line and instrument currently assigned telephone number (914) 561-1906 and spoke to a male named "Louie." Colombo told Louie that he 'just spoke to Jerry now" and asked Louie if Jerry has another store. Louie replied that be did not know tbat Jerry bas "another phone store" and that there might be one in "Poughkeepsie." Colombo told Louie that he would get him the check. It is my opinion, based on these calls, that Christopher Colombo has a ce11ular telephone on which he receives calls relating to this gambling enterprise. The use of a cellular telephone is consistent with the behavior of those involved in an illegal gambling enterprise who are concerned about possible law enforcement action. Moreover, these calls reveal that Colombo keeps tabs on individuals who are responsible for paying off debts.

---

14 This outgoing call was recorded over the Christopher Colombo home telephone line as call number 046 on our monitoring equipment.

15 This outgoing call was recorded over the Christopher Colombo home telephone line as call number 047 on our monitoring equipment.

16 This outgoing call was recorded over the Christopher Colombo home line as telephone call number 048 on our monitoring equipment.

29. This opinion is bolstered by a call made by Christopher Colombo over the Anthony Colombo home phone at approximately 6:52 p.m. to the telephone line and instrument cummtly assigned telephone number (914) 562-2020. Christopher told the girl who answered the phone "Seafood City" that he was "Chris Co]ombo" and was looking for "Louie." Christopher told Louie he was calling from "my brother's phone number. I'm at his house" and asked Louie "did somebody drop the check om" Louie responded, "I don't know. I just walked in." Christopher told Louie "if you check at the bar it should be there" and that.'They told me they brought it." Louie told Chris "rlJ look around." In my opinion, this conversation reveals that Seafood City is a restaurant operated by Christopher Colombo and that individuals can leave money for Christopher at the restaurant.

30. Two days later, on August ]4,2000, at approximately 10:19 a.m., Anthony Colombo caUedl1 the Philip Dioguardi home phone from his home phone and the two discussed whether Dioguardi was going to stop at Anthony's house that day. The two agreed that Dioguardi would "be by about] 1 :30:' This call reveals that Dioguardi meets with Anthony at his house on a routine basis. Moreover, these meetings, where Dioguardi goes to the homes of Anthony and/or Christopher on a daily basis are consistent, in my opinion, with those involved in the delivery of paperwork regarding a gambHng operation.

---

J7 This outgoing call was recorded over the Anthony Colombo home phone as call number 132 on our monitoring equipment. The call was also recorded as incoming call number 044 over the Philip Dioguardi home phone on our monitoring equipment.

31. This opinion is buttressed by a can later that day, at approximately 8:29 p.m. At that time, Christopher Colombo received a caWs over his home phone from the Anthony Colombo home phone. Christopher told his brother Anthony that he has "a bunch of CD's I never watched before." Anthony told Christopher that he would "be over in a few minutes." Christopher replied that, "} just got to do some figures so you know I'll be awake through that, so come on over." The use of the term "figures" in this conversation means, in my opinion, that Christopher Colombo has to determine the amounts of gambling payroll and payoffs for the week based on the figures and bet amounts. This conversation further reveals that both Christopher and Anthony are involved in this gambling enterprise.

32. On August 15,2000, at approximately 11 :54 a.m., the Christopher Colombo home phone received an incoming caW9 from the telephone line and instrument currently assigned telephone number (914) 783-3964, listed to Edward Robinson and located at 3 and one-half Mangin Road, Town of Monroe, State of New York.2O The male introduced himself to Colombo's wife, "Suzanne," as "Eddie." Eddie told Suzanne he's "going in to the Plum House." Through Suzanne, Christopher agreed to meet Eddie there at 1 :30 p.m. Later that afternoon Christopher called Dioguardi on his cell phone and asked him where he was. pioguardi responded, "I'm on the

---

18 This incoming can was recorded over the Christopher Colombo home phone as call number 093 on our monitoring equipment. It was also recorded as outgoing call number 144 over the Anthony Colombo home phone on our monitoring equipment.

19 This outgoing can was recorded over the Christopher Colombo home telephone line as can number 112 on our monitoring equipment.

20 For a detailed discussion of Edward Robinson, see Investigator McCabe's affidavit submitted in support of the original eavesdropping warrant.

Thruway. I'll be there in fifteen minutes." These conversations reveal, in my opinion, that Christopher Colombo likes to meet people involved in his gambling organization, including Robinson and Dioguardi, in person rather than speak to them on the phone. This is consistent with the behavior of those involved in an illegal gambling entetprise who are wary of possible law enforcement eavesdropping.

33. On August 15,2000, Anthony Colombo received acall21 over his homepbone nom a male he identified as "Ray." Anthony asked Ray ifhe wanted to meet "for lunch about 12:00 at tbe truck stop tomorrow." Ray agreed. Anthony then called22 the Dioguardi home phone and asked Dioguardi, "you want to pick me up twenty-five after 11 :00, we'll have luncb at 12:00?" Dioguardi agreed and said, "good." It is my opinion that the fact that Ray and Anthony are aware ofthe truck stop's location reveals that they have had meetings there in the past. Later that day, Dioguardi gave another male directions to the truck stop.

34. Surveillance was initiated at the Route 17 truck stop in Mahwah, New Jersey at approximately 11 :20 a.m., on August 16, 2000. At 11 :35 a.m., a 1989 Mercury four door, gray in color, bearing New York Registration HGZ-880, was seen parked in front of the Route 17 Diner, located inside the truck stop area. A check with the New York State Department of Motor Vehicles reveals that this car is registered to Sebastian Accolla. The team also observed a car registered to

---

21 This incoming call was recorded over the Anthony Colombo home phone as call number 179 on our monitoring equipment.

22 This outgoing call was recorded over the Anthony Colombo home phone as call number 180 on our monitoring equipment. This can was also recorded as incoming call number 062 over the Dioguardi home phone on our monitoring equipment.

T

Carol Colombo parked in the Diner's parking lot. The surveillance team observed Anthony Colombo and Philip Dioguardi in the company of another male inside the diner. A member of the investigative team, inside the diner when Colombo, Dioguardi, and the third male left. heard a diner employee say to the third male, "have a nice day, Ray." It is my opinion that Colombo and

Dioguardi met Ray AccoHa in a truck stop in New Jersey to avoid law enforcement detection and that such meetings are consistent with the behavior of individuals involved in an illegal gambling operation.

35. On August 17, 2000, at approximately 8:12 a.m., Christopher Colombo received an incoming telephone can23 over his home telephone from a male who identified himself as "Gus." Gus asked Christopher ifhe wants him to go to "the meeting" with him. Christopher asked Gus "how many guys should be at the meeting?" and Gus replied, "they're painting us the wrong way on this. . .like animals, the motherfucker went too far." Christopher told Gus he will leave his house at 9:00 a.m., and pick Gus up on 24th Street between 3rd and Lexington Avenues. This behavior, of bringing additional people to a so-called meeting is consistent with the behavior of those involved in an illegal business enterprise who are afraid of what may happen at a meeting and want people to back them up and be a witness.

---

23 This incoming telephone call over the Christopher Colombo home telephone was recorded as call number 205 on our monitoring equipment.

36. On August 20, 2000. at approximately 11 :28 a.m.. Dioguardi dialed24 the Berlingieri cellphone. assigned telephone number (917) 723-3915. Ferrara, who answered the cellphone, discussed "Skinny's figures" with Dioguardi. Ferrara also told Dioguardi about "Jimmy being in the red for three hundred thousand to the office." In my opinion, this call reveals that Dioguardi can call Ferrara on the Berlingieri cellphone when he is not at home and that the two keep up to date on the amount of money owed to the gambling operation.

37. On August 21, 2000, at approximately 8:54 a.m., Dioguardi called2s the Ferrara phone from his home phone. Dioguardi reminded Ferrara that he was "supposed to can before ten." Ferrara replied that he has "io wait for Bobby. They didn't bring it last night." Dioguardi asked. "did you tell them I have to go upstate? Teil them I want the work by one o'clock." Ferrara explained to Dioguardi that "they had to wait for the Red Sox game to be over." This call reveals, in my op}nion. that Ferrara is in charge of getting aU of the gambling sheets, or "work" as it is called. in order to give it to Dioguardi to take upstate, for Christopher Colombo's review. The fact that they did not bring the work to Ferrara because they were waiting for a baseball game to end shows that the "work" is indeed gambling paraphernalia.

38. On August 23. 2000. a series of calls between Dioguardi. Ferrara, and Christopher Co]ombo provided an example of how they are all intimately involved in this gambling

---

24 This outgoing call was recorded over the Dioguardi home phone as call number **110** on our monitoring equipment.

*2S* This outgoing call was recorded over the Dioguardi home phone as call number 116 on our monitoring equipment. It was also recorded as incoming call number 204 over the Ferrara phone on our monitoring equipment.

enterprise. At approximately 8:21 p.m., Dioguardi called 26 the Fen-ara phone fTom his home phone. The two discussed payout auangements, namely that "we should pay Tuesday and players should pay Wednesday." Feuara told Dioguardi that "Junior hasn't paid and lost more." During the fonowing call on both lines, the two continued to discuss the fact that "Junior" is "stuck with twenty- eight and has to pay." Fen-ara told Dioguardi, "Randy said he'll get it to me." Dioguardi stated that he wiU "be in New York City tomorrow." In my opinion, these calls reveal that Dioguardi and Ferrara set the day to day policy of the wirerooms and tbe payment schedule for winners and losers who bet.

39. Dioguardi immediately received a call fiom a male named Bobby who told Dioguardi that they "want to get paid on Tuesday." The two then discussed the "work." As soon as Dioguardi hung up with Bobby, he caned back Ferrara and complained about Bobby's can. Dioguardi told Ferrara that Bobby said he is "picking up after every game." Ferrara stated that he "picks up slips after every game and erase the board." These two calls reveal that individuals can can Dioguardi to complain about the way Ferrara deals with the wireroom work and how quickly he takes away the evidence of the gambling.

40. This series of calls continued at approximately 9:03 p.m. that same evening when Dioguardi again called27 the Ferrara phone fiom his home phone. Dioguardi asked Ferrara, "did we change the locks at the joint, the joint on 118th Street?" Ferrara said "no" and Dioguardi

26 This outgoing caU was recorded over the Dioguardi home phone as call number 136 on our monitoring equipment. It was also recorded as incoming call number 294 over the Ferrara phone on our monitoring equipment.

27 This incoming caU was recorded over tbe Dioguardi home phone as call number 143 on our monitoring equipment. It was also recorded over the Ferrara phone as incoming call number 296 on our monitoring equipment.

T

replied, "Bobby thinks someone went through the garbage and found work:' Ferrara told Dioguardi that they "recycle" and that "bums" go through the garbage. Ferrara also told Dioguardi that he "takes work tram the room every night back to the Bronx." During this caU, Dioguardi received an incoming caU28 fiom Christopher Colombo. Dioguardi answered it while putting Ferrara on hold. Colombo told Dioguardi that he was "concerned about work outside the room, not inside the room." Dioguardi told Colombo that "it's recycling" and that "no one goes in the apartment." These caUs reveal that Colombo is also involved in solving problems relating to the wirerooms and that there is a wireroom in an apartment on I 18th Street and a place to store the work in the Bronx.

      41. On August 25, 2000, at approximately 10:11 a.m., Ferrara received an incoming ca1J29 over his home phone ITom a male named Bill. The two discussed when Bil1 would be paid and the two agreed to meet the next morning at 10:30 a.m. Bill told Ferrara that he "wil1 be hiring Joe to work during football season." This cal1 reveals, in my opinion, that Femmt al1ows wireroom bosses such as Bill to hire his own help for the busy football season.

      42. On August 26, 2000, at approximately 4:03 p.m., Dioguardi received a cal130 over his cell phone nom a male. The male told Dioguardi that he "can't see John today." When Dioguardi asked "why not," the male replied "because the bagel guy can't settle up untit Monday."

---

[28] This incoming call was recorded over the Dioguardi home phone as incoming call number 144 on our monitoring equipment.

[29] This incoming call was recorded over the Ferrara phone as call number 341 on our monitoring equipment.

[30] This incoming caU was recorded over the Dioguardi cell phone as call number 072 on our monitoring equipment.

The male told Dioguardi that he "paid him. .. late" to which Dioguardi replied, "they pay me on Tuesday." The two discussed how much various people owed and Dioguardi finally said, "I prefer Tuesday, Wednesday." The use of the term "settle up," is used, in my experience, to mean the collecting of money owed on gambling losses. This conversation reveals, in my opinion, that the male is a sheet, responsible for several bettors and that he is having a problem collecting on the bets so that he can settle up with John Ferrara. This shows that individual sheets can caU Dioguardi with a problem before having to meet with Ferrara.

43. On August 28, 2000, at approximately 7:24 p.m., Christopher Colombo received a caWI over his home phoDt; fi'om a male who identified himself as "Joe, Danny's son." Joe told Colombo that he "spoke to my father" and that his father told Joe to "caU Chris and ten him that you and Philly are back on the list." Colombo asked Joe, "when does your father want us to come?" and Joe replied, "Friday afternoon, twelve, twelve-thirty," Colombo then called Dioguardi and told him about it. On Friday, September 1,2000, the surveillance team observed Christopher Colombo enter Otisville Federal Prison. I have been informed by prison officials at Otisville, that Daniel Pagano is an inmate at that facility and that Christopher Colombo visited with Pagano that day. Moreover, I have been informed by both Otisvi1Ie prison autborities and the Rockland County District Attorney's Office that Daniel Pagano has a son named Joe. It is my opinion that Colombo went to Pagano to talk to bim about the gambling business as Pagano is in a position senior to Colombo in the organization.

---

31 'fhjs incoming can was recorded over the call number Christopher Colombo home phone as 598 on our monitoring equipmenl

44. As noted in my previous affidavit, it is my opinion that John Berlingieri and John Ferrara are the same person. This opinion has been bolstered by a call recorded over the Ferrara home phone on September 1,2000. At approximately 1:26 p.m., on that date, Ferrara received a calp2 over his home phone ITom Sprint Spectrum telephone company. Ferrara answered the phone and the Sprint representative asked him ifhe was "John BerlingieriT and he stated that he was. The Sprint representative then asked him ifhe was the subscriber for the home phone and he replied that he was not and hung up. This call shows that Berlingieri and Ferrara are indeed tbe same person. Moreover, the fact that Ferrara uses an another name for his cellphone is consistent in my experience with those involved in megal activities who want to avoid possible law enforcement detection.

45. Later that day, at approximately 3:35 p.m., Ferrara dialed33 the telephone line and instrument currently assigned telephone number (347) 386-0631. Ferrara called the male who answered the phone "Ants." The investigative team informs me that the voice of "Ants" on this line is the same voice of a male Ferrara calls "Ants" at (718) 518-7031, listed to Anthony Sedia, 1103 Neill Avenue, Bronx, New York. Thus, Ants is, in my opinion, Anthony Sedia. Ants told Ferrara that "my sheet has been good" but that he has this "kid" who is "costing me money." Ferrara asked, "well, how much does he owe the office?" Ants replied that "Tommy owes me forty three hundred" and he "owes the office thirty six hundred, the rest is mine." Ants suggested that Ferrara call Tommy and gave Ferrara a telephone number for Tommy as well as his address. Ferrara stated that

---

32 This incoming can was recorded as call number 5 I 2 over the Ferrara home phone on our monitoring equipment.

33 This outgoing call was recorded over the Ferrara home phone as call number 521 on our monitoring equipment.

24

he will "tell him that he shut Ants sheet out of the office and no one can come in until you pay." This call reveals, in my opinion, that Ants is a sheet for Ferrara and that one of his gamblers owes the organization, or office, $3600 and owes Ants his commission, the other $700. Ferrrara caned Ants at home later that night and told him that Tommy will pay one thousand now and possibly one thousand next week. This calJ reveals, in my opinion, that Ferrara uses the Berlingieri cell phone to make gambling-related cans.

46. At approximately 8:46 p.m., that evening, Dioguardi caIJed[34] the Berlingieri cell phone and FelTara answered. FeJTara told Dioguardi that he "paid the rent" and that he was "coming home twenty-five dollars short." The two discussed the payroll and the employees who worked in the wireroom during the week. FeITara stated that he had to pick up money ftom "Skinny" and "Randy." Dioguardi asked "who's working this weekend?" FeITara replied, "Jeff, Brian, and me." In my opinion, this call shows that Dioguardi and FeITara speak regularly, including over the Berlingieri cell phone, about the payment ofthe employees and the monies owed by various sheets and bettors to the organization. Moreover, in my experience the use of the tenn "dollars" refers to hundreds and is used by individuals engaged in megal gambling operations to not draw attention to the large amounts of money involved in their business.

47. Interceptions during this period also reveal that the targets of this investigation

are using yet another gambling wireroom as an office. On September 4.2000. at approximately 6:50 p.m., Dioguardi received a ca1l3s from telephone number (631) 9684761. A male told Dioguardi

---

[34] This outgoing call was recorded over the Dioguardi home phone as call number 422 on our monitoring equipment.

[35] This incoming call was recorded over the Dioguardi home phone *as* call nwnber 465 on our monitoring equipment.

that he is <'wjth Peter and wants to open an account." Dioguardi told him «the number is (212) 427. 5258 and (you) will be 3002 for ghost."

48. Dioguardi also told the male that he had a «$2500 limit" and that he shou1d "vait two minutes so I can call them and let them know." This can reveals, in my opinion, that the male wanted to bet at a wireroom and that Dioguardi gave the male a code number to use and gave him the wireroom telephone number. The Ughost" title refers to the sheet that the male will bet on and the person who will be responsible for collecting and paying out the bets for him. Moreover, the limit is the amount of money the male can bet on credit, in this case $2500, before the wireroom will not accept his bets. Finally, Dioguardi wants to caU the wireroom and ten them to accept the male's betting code which shows Dioguardi's control over who is aHowed to place bets at a wireroom and for how much money.

49. The telephone number that Dioguardi gave to the male to use to place bets is listed to Blair Robinson at 2288 First Avenue, New York County. This location is at the comer of 1 18th Street and First Avenue, three blocks :ITom Ferrara's home. In fact, several days earlier, on August 28, 2000, at approximately 1 :41 p.m., Ferrara called36 Venzon Wireless from his home phone and asked for the uaccounting department." During this call, Ferrara identified himself as «Blair

Robinson" and gave as his home phone number, (212) 427-5258. The Verizon representative told him that the "balance due on the phone is $92.96." This call reveals, in my opinion, that the person using the names John Ferrara and BJ:rir Robinson are one and the same and that Ferrara is in charge of the telephone service for the wireroom.

---

[36] This outgoing call was recorded over the Ferrara home phone as calJ number 402 on our monitoring equipment.

50. Surveillance teams have been able to observed Dioguardi's car in the driveway of both Anthony and Christopher Colombo's houses. The surveillance team cannot discern what the targets are discussing while the car is there. Moreover, the surveillance team has observed Dioguardi talk to FeITara without being able to know what the conversation is about. They can observe Ferrara walk to and fium his residence and watch Dioguardi enter and leave his house. None of this surveiJ]ance will enable the investigative team to understand what the subjects **are** doing. Moreover, attempts by the team to follow Dioguardi has resulted in having to call off the surveillance almost every time due to Dioguardi's driving habits. He continually drives at twenty miles per hour, even on the highway. He c.onsistently makes V-turns and stops in the middle of streets, sometimes sitting still for thirty minutes straight. For these reasons, surveillance have been difficult.

51. Moreover, it should be noted that Christopher Colombo lives on a rural street in a wooded area with no houses opposite or behind his and with the two neighboring houses far away. As such, conducting surveillance without being detected has been extremely difficult as there is no place for the surveillance team to park and watch the goings on at the house or even on the street in front of the house. In my opinion, any attempts to approach this residence for the pUIpose of conducting overhears would not succeed as the house has land around it so that surveillance teams might be easily seen and may jeopardize the investigation. Even if we were able to conduct overhears at the residence, we would likely only hear one side of those telephonic conversations being engaged in by the targets, which conversations would not satisfy all of the objectives of this investigation as set forth in the annexed Affidavit of Assistant Deputy Attorney General Meryl Lutsky. Similarly, Dioguardi is on his cell phone all day and evening and spends the mornings with

27

the Colombos. Surveillance on his home, therefore, would not further the investigation. Moreover, Ferrara lives in an apartment building. Surveillance teams could not stay in and about the hallways on the 3rd floor of a Manhattan apartment building without attracting attention and jeopardizing the investigation.

52. Based upon all of the foregoing, there is probable cause to believe that Plllllip Dioguardi, Christopher Colombo, Anthony Colombo, and John Ferrara, their agents, co-conspirators and others as yet unknown, are committing the crimes of Promoting Gambling in the First and Second Degrees, Possession ofGamblIng Records in the First and Second Degrees and Conspiracy to commit those crimes, in violation of Articles 225 and 105 ofthe Penal Law ofthe State of New York. Moreover, there is probable cause to believe that Philip Dioguardi, Christopher Colombo, John Ferrara, and their associates are involved in an illegal gambling operation and that the above- mentioned telephone lines and instruments are being used in furtherance of this operation.

53. As set forth in the annexed affidavit of Assistant Deputy Attorney General Meryl Lutsky, the pUJpose of this investigation is not merely the apprehension of Philip Dioguardi, Christopher Colombo, Anthony Colombo, John Ferrara, and their associates for illegal gambling related activities. Instead, it is our objective to learn the full extent of the aforesaid illegal gambling activity and to develop sufficient evidence as to the roles, identities, whereabouts and participation

of aU members of the illegal bookmaking operation, and to successfully prosecute all those involved in that activity. including those who report gambling activities, Jay-off wagers, taUy monies gained from the gambling enterprise and money owed by the enterprise. and give and take instructions regarding the day to day operations of the gambling enterprise over the above-mentioned telephone lines, their superiors. and others associated with iUegal bookmaking.

54. Based upon the foregoing, it is reasonable to conc1ude that Philip Dioguardi, Christopher Colombo, Anthony Colombo, John Ferrara, and others are involved in illegal bookmaking activity and are using the above-mentioned telephone lines and instruments to conduct that activity. However, there is a vast amount of information I cannot learn and evidence I cannot gather unless court-authorized eavesdropping is used on these telephone lines and instruments. For example, I cannot learn the nwnber of wire rooms reporting to Ferrara, Dioguardi, and the Colombos or the dollar amount of the gambling operations being conducted at those wirerooms. Also, I cannot learn the number of wagers being accepted by these illegal wirerooms, nor can I learn the amount of bets layed-offby this gambling organization to otherwirerooms. Similarly, I cannot learn what other partners or workers the Colombos, Dioguardi, or Ferrara may have and the dollar amount of the overall operation, unless we are able to intercept the calls of these individuals and learn the dollar amounts, number of wagers, and nwnber of wire rooms that are involved in this gambling operation. Only by using court-authorized eavesdropping on the subject telephone lines, which are at the center of this illegal gambling operation, can we conclusively determine who all members of the operation might be, their roles in the operation, the scope of the operation or gather evidence against the participants.

55. Based upon my training and experience in gambling-related investigations, bookmakers often use electronic pagers in furtherance of their operation. It is important that bookmakers remain accessible to their cHentele and therefore many bookmakers carry pagers/beepers. It should be noted that during my review of data generated by the pen registers and trap and trace devices attached to the subject telephone lines and instruments, I obseIVed what appeared to be nwnerous pager numbers being called by the subject telephones. As such, we seek

autborization to intercept certain electronic communications to digjtal pagers as they are dialed over the subject telephones.

56. Furthermore, thus far the use of conventional surveillance techniques has been unsuccessful in achieving all of the objectives ofthis investigation. As noted above, on numerous occasions, investigators have conducted surveillance of the residences of Cluistopher and Anthony Colombo, as wen as John Ferrara and PhiHp Dioguardi. However, these surveillance have only resulted in observations of Dioguardi's automobiJe parked at the residence of one ofthe Colombo

brothers during the morning, and his meeting with FeITara. Thus far, we have not been able to conduct "overhears" at any of the subject locations or at the originally identified wirerooIIl which has since moved. As noted above, the new wireroom is also inaccessible as the building is made up of wire rooms and outsiders are not welcome. "Overhear" is a tenn which is used to describe when a member of law enforcement is able to physically position himseWherself outside of a target location in an attempt to "overhear" any conversations occurring inside of that location. In fact, any such attempts in the instant case may jeopardize this investigation. The Colombo residences are located in a rural area and, in my opinion, any attempts to conduct "overhears" would not be successful. As for Dioguardi, as noted above, he is never home so overhears at his house, if possible, would not further the investigation. Finally, overhears in a crowded apartment building are difficult at best and would probably not go un-noticed by neighbors. As well, for the reasons set forth in Assistant Deputy Attorney General Lutsky's affidavit, even though we have been able to conduct physical surveilJance at the subject residences and in the vicinity of the wireroom, the survemance alone are of limited utility in achieving all of the objectives of our investigation.

57. Additionally. although a CI has provided information concerning the instant investigation and targets thereof, there is little more that can be accomplished by his/her information or actions. That is, the CI does not have knowledge or information relating to the full extent of this illegal gambling operation. I am further informed that, because of the crs fear of the targets of this investigation and to ensure the physical safety of the CI and the crs family, the CI is not willing to testifY against Philip Dioguardi, Christopher Colombo, Anthony Colombo, and John Ferrara. or any of their associates.

58. I bave been involved in numerous gambling investigations and based upon my experience and on the facts set forth in this affidavit, I believe that Philip Dioguardi, Christopher Colombo, Anthony Colombo, and John Ferrara, their agents, co-conspirators, and others as yet unknown, are engaged in an illegal bookmaldng operation and that the above-captioned telephone lines and instnnnent have been, are being and are about to be used for illegal gambling. I know from my experience and training and from the facts set forth above that persons involved in bookmaking do so by accepting bets over the telephone. fu my experience, any successful bookmaking operation depends upon the use of telephones not only to accept wagers, but to contact "hedge rooms" in order to "lay-off' bets, and other locations to obtain the "lines," as well as to report activity to accountants, middlemen, and bosses of the gambling organization.

59. In my opinion, a bookmaking operation cannot survive without the consistent use of telephones. Indeed, the infonnation provided by the pen registers and trap and trace devices (Caller ill) attached to the above-captioned telephone lines and instruments, coupled with those other factors detailed above, has established probable cause to believe that discussions regarding the

scope, daiJy activjty, betting amounts, and Jay-off needs have been and are being conducted over the

subject telephone lines and instruments.

*~fMt=¿JL--*
STIGATOR JOSEPH MCCABE
New York State Police

Sworn to before me this
7th day of September, 2000

Notary **Public**

**LYNN GOODMAN**
**Notary Public, State of New York**
**No. 4954819**
**Qualified in** Westchester. Expires **County**
**Commission** ¹