SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:    SECOND DEPARTMENT
------------------------------------------------------------------------------------------X
In the Matter

-of-

The Interception of Certain Telephonic and Electronic
Communications Occurring Over the Cellular Telephone
Line and Instrument Currently Assigned Telephone
Number (914) 443-8182,  with electronic serial number
17904462477, subscribed in the name of Anthony
Colombo and billed to Philip Dioguardi at 2 East Main
Street, Number 4, Town of Middletown, County of Orange,
State of NewYork;
------------------------------------------------------------------------------------------X
**AND**

The Interception of Certain Telephonic and Electronic
Communications Occurring Over theTelephone Line and
Instrument Currently Assigned Telephone Number
(914) 496-6506, listed to Lucille Colombo and located
at 51 Horton Road, Village of Washingtonville, Town of
Blooming Grove, County of Orange, State of New York;
------------------------------------------------------------------------------------------X
**AND**

The Interception of Certain Telephonic and Electronic
Communications Occurring Over theTelephone Line and
Instrument Currently Assigned Telephone Number
(914) 496-8201, listed to Anthony Colombo and located
at 25 Horton Road, Town of Blooming Grove, County of
Orange, State of New York;
------------------------------------------------------------------------------------------X
**AND**

The Interception of Certain Telephonic and Electronic
Communications Occurring Over theTelephone Line and
Instrument Currently Assigned Telephone Number
(914) 343-3313, listed to Philip Dioguardi and located
at 2 East Main Street, Town of Middletown, County of
Orange, State of New York.
------------------------------------------------------------------------------------------X

**AFFIDAVIT IN
SUPPORT OF AN
APPLICATION FOR
AN EAVESDROPPING
WARRANT**

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF WESTCHESTER      )

JOSEPH McCABE, being duly sworn, deposes and says:

1.     I am an Investigator with the New York State Police (hereinafter "NYSP"), assigned to the Special Investigations Unit ("SIU") at the New York State Organized Crime Task Force (hereinafter "OCTF"). I have been a member of the NYSP for more than nineteen (19) years, during which time I have made, or assisted in, more than three hundred (300) arrests for Promoting Gambling and Possession of Gambling Records in cases involving allegations of illegal bookmaking. I have acted in an undercover capacity on numerous occasions, placing bets myself with various bookmakers over the telephone. I have also interviewed numerous bookmakers, wherein I discussed the means and methods of their illegal activities, in particular, operating a wireroom. I have also supervised dozens of investigations which utilized court-authorized electronic surveillance. During these investigations, I intercepted and analyzed thousands of conversations relating to illegal bookmaking activities. Further, I have been involved in the execution of dozens of court-ordered search warrants of illegal wirerooms, which resulted in the seizure of, and my subsequent analysis of thousands of gambling records. For the past eight years, I have solely conducted gambling-related investigations and I have testified before grand juries as an expert witness in the area of illegal bookmaking.

2.     An on-going investigation being conducted by OCTF and the NYSP has revealed probable cause to believe that Christopher Colombo, Anthony Colombo,

                           2

Philip Dioguardi, John Ferrara, their agents, co-conspirators and others as yet unknown

are engaged in, and continue to engage in, the crimes of Promoting Gambling in the First

and Second Degrees, Possession of Gambling Records in the First and Second Degrees

and Conspiracy to commit those crimes in violation of Articles 225 and 105 of the Penal

Law of the State of New York. Our investigation has also established probable cause to

believe that the above-captioned telephone lines and instruments have been and will

continue to be used to discuss and engage in those crimes. Consequently, this affidavit

is submitted in support of the Application by George B.Quinlan, Deputy Attorney General

In-Charge of the Organized Crime Task Force, for an Eavesdropping Warrant authorizing

the interception and recording of certain telephonic and electronic communications

occurring over the telephone lines and instruments currently assigned the following

telephone numbers: (914) 443-8182, bearing electronic serial number 17904462477,

subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2

East Main Street, Number 4, Town of Middletown, County of Orange, State of New York;

(914) 496-6506, subscribed in the name of Lucille Colombo and located at 51 Horton

Road, Village of Washingtonville, Town of Blooming Grove, County of Orange, State of

New York; (914) 496-8201, subscribed in the name of Anthony Colombo and located at 25

Horton Road, Town of Blooming Grove, County of Orange, State of New York; and (914)

3

343-3313, subscribed in the name of Philip Dioguardi and located at 2 East Main Street, Town of Middletown, County of Orange, State of New York.[1]

3.     Unless otherwise indicated, the facts set forth in this affidavit are based upon my own observations and knowledge, upon my examination of the investigative reports prepared by OCTF and the NYSP, upon my conversations with members of OCTF, other members of the NYSP and a confidential informant, and upon my review of telephone toll records and pen register and trap and trace device data.

4.     All dates and times referred to herein are approximate. Furthermore, unless otherwise noted, where statements of other individuals are described, those descriptions are intended to convey the sum and substance of such statements, and are not necessarily exact quotes. This affidavit is submitted for the sole purpose of supporting an application to conduct electronic surveillance. Consequently, not every detail or aspect of our ongoing investigation has been noted herein.

5.     Based upon the facts developed during this investigation, on May 1, 2000, the Honorable Daniel W. Joy, Justice of the Supreme Court of the State of New York, Appellate Division, Second Department, issued an Order for Pen Registers and Trap

---

[1]     Subject John Ferrara's telephone line and instrument, currently assigned telephone number (212) 410-7444, subscribed in the name of Theresa Ferrara and located at 420 East 115th Street, 3rd floor, apartment 3, County of New York, State of New York, is located within the geographical jurisdiction of the Supreme Court of the State of New York, Appellate Division, First Department. An application for an eavesdropping warrant on this telephone instrument is also being submitted to the First Department on this date.

4

and Trace Devices authorizing the installation and use of pen registers and trap and trace devices (Caller I.D.) on the telephone lines and instruments assigned the following telephone numbers: (914) 443-8182, bearing electronic serial number 17904462477, subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2 East Main Street, Number 4, Town of Middletown, County of Orange, State of New York; (914) 496-6506, subscribed in the name of Lucille Colombo and located at 51 Horton Road, Town of Washingtonville[2], County of Orange, State of New York; (914) 496-8201, subscribed in the name of Anthony Colombo and located at 25 Horton Road, Town of Blooming Grove, County of Orange, State of New York; (914) 343-3313, subscribed in the name of Philip Dioguardi and located at 2 East Main Street, Town of Middletown, County of Orange, State of New York; and (917) 560-0397, bearing electronic serial number 316010009486930, subscribed in the name of Jeffrey Rosen, 1444 11th Street, Fort Lee, New Jersey.

6.     Furthermore, on June 15, 2000, the Honorable Eugene Nardelli, Justice of the Supreme Court of the State of New York, Appellate Division, First Department, issued an Order for a Pen Register and Trap and Trace Device authorizing the installation and use of a pen register and trap and trace device (Caller I.D.) on the

---

[2]     Frontier Communications telephone company, the local telephone provider for this area of Orange County lists this address in the Town of Washingtonville, not the Village of Washingtonville. A review of the road signs in this area as well as Hagstrom maps of the county indicate that the Village of Washingtonville is actually located within the confines of the Town of Blooming Grove.

5

telephone line and instrument assigned telephone number (212) 410-7444, subscribed in the name of Theresa Ferrara and located at 420 East 115th Street, 3rd floor, apartment 3, County of New York, State of New York.

7.    On June 29, 2000, the Honorable Sondra Miller, Justice of the Supreme Court of the State of New York, Appellate Division, Second Department, issued an Order Extending the use of Pen Registers and Trap and Trace Devices on the telephone lines and instruments assigned the following telephone numbers: (914) 443-8182, bearing electronic serial number 17904462477, subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2 East Main Street, Number 4, Town of Middletown, County of Orange, State of New York; (914) 496-6506, subscribed in the name of Lucille Colombo and located at 51 Horton Road, Town of Washingtonville, County of Orange, State of New York; (914) 496-8201, subscribed in the name of Anthony Colombo and located at 25 Horton Road, Town of Blooming Grove, County of Orange, State of New York; and (914) 343-3313, subscribed in the name of Philip Dioguardi and located at 2 East Main Street, Town of Middletown, County of Orange, State of New York.[3]

8.    For the purpose of the instant Application, I incorporate herein by reference the May 1, 2000 Order for Pen Registers and Trap and Trace Devices, the

---

[3]    The cellular telephone assigned telephone number (917) 560-0397 was canceled by the subscriber four days after the May 1, 2000, order for pen registers and trap and trace devices was signed. Therefore, no request was made to extend the use of such devices on that telephone instrument.    Moreover, an affidavit in support of that order mistakenly referred to the attached and incorporated June 15, 2000, application for a pen register and trap and trace device, as having been signed on May 15, 2000.

6

June15, 2000, Order for a Pen Register and Trap and Trace Device, the June 29, 2000, Pen Register Extension Order, and all affidavits submitted in support of their issuance as if they were fully set forth at length below.

9.     As stated above, an ongoing investigation, being conducted by OCTF and the New York State Police, has revealed probable cause to believe that Christopher Colombo, Anthony Colombo, Philip Dioguardi, John Ferrara, their agents, co-conspirators and others as yet unknown, are engaged in illegal bookmaking.

## THE STRUCTURE AND OPERATION OF A SPORTS BOOKMAKING OPERATION

10.     Generally, to place a bet with a sports bookmaking operation, an individual simply calls the bookmaker (or the bookmaker contacts the bettor, depending on their relationship) or, one of his employees, or someone who is normally characterized as a "runner" ( a term which will be explained infra). In this telephonic communication, the bettor will often inquire about the "line," or odds, relating to the sporting event, and will then place his wager. The bookmaker, or an employee, or the runner then records the wager. In most cases the bettor identifies himself by either a number or account name to ensure confidentiality. Bets are largely taken over the telephone and generally on credit; that is, no money need be tendered before the wager is accepted. In addition, the bulk of this telephone betting takes place during what is considered prime bookmaking hours. These hours are usually 11:00 a.m. to 2:00 p.m. and 5:00 p.m. to 8:30 p.m., seven days a week. These "traditional" bookmaking hours are flexible from one bookmaking operation to another, generally dependant upon the time of year and the sporting events associated

7

with that time of year, as well as the size of a particular bookmaking operation. For example, when college and professional sporting events began on weekend afternoons in the fall, weekend hours may have been 10:00 a.m. to 8:00 p.m. to accommodate those bettors wishing to place bets on any of the college and professional sporting events being played that day. Also, before the start of the college and professional hockey and basketball seasons, many bookmaking operations did not have Sunday evening hours, since there were very few professional baseball and football games taking place on Sunday nights. Bettors may be required to place such bets on Sunday evening events before 8:00 p.m.

11. The bookmaker and his employees, most often accept bets at a location which is referred to as a "wireroom." A wireroom can be a home, office or apartment which is operated by a bookmaker and which contains one or more telephones set up for the purpose of accepting a high number of wagers in a short amount of time. Although the wireroom may be manned by the bookmaker himself, it is often staffed by employees, also known as "sheetwriters." Sheetwriters perform the task of accepting and recording telephone wagers. Wirerooms often have a number of different accounts, headed by persons known as "runners." A runner is an individual who accepts bets from others (and is, in effect, a bookmaker for those bettors) and then forwards them into the wireroom under his code name. He may also permit certain persons (bettors) to call the wireroom directly and use the runner's code name and line of credit in order to place bets.

8

In this manner, the runner screens the potential bettors for the bookmaker, and is responsible for collecting debts owed by the bettor to the bookmaker.

12. The runner may have a "quarter-sheet" or "half-sheet," a term which indicates the amount of the runner's commission on bets made through him to the bookmaker. For example, if a bettor bets one hundred ($100.00) dollars with his runner on a sporting event such as a football or basketball game and loses, he becomes indebted to the runner in the amount of one hundred and ten dollars ($110.00), there being a ten percent (10%) surcharge on losing wagers. This ten percent surcharge is commonly referred to as the "vigorish" or the "vig." The runner is responsible for ensuring that the bookmaker receives the one hundred and ten dollars ($110.00), less either twenty-five (25%) percent or fifty (50%) percent (depending on whether he has a quarter-sheet or a half-sheet), which is the runner's commission. If he wins, the bettor receives one hundred dollars ($100.00), for which the bookmaker is responsible for either fifty (50%) percent or seventy-five (75%) percent, and for which the runner is responsible for the remaining portion (again depending on whether the runner has a half-sheet or quarter-sheet). The runner will receive the money from those in charge of the wireroom, and he will in turn pay the winning bettor.

13. A bookmaker can "lay-off" or "hedge" the excess amount of money that is being bet on a team to another bookmaking operation. Here, the bookmaker places a wager for the excess amount of money bet on one team in his gambling operation with another bookmaker. For example, if bookmaker "A" has one thousand ($1,000.00) dollars

9

more wagered on New York than another team, he calls bookmaker "B" and places a wager with "B" on New York for one thousand ($1,000.00) dollars in order to earn a risk-free profit through balancing his books. While this is not done in all instances with every game, a bookmaker must have a business relationship with another bookmaker as insurance to guard against a loss coming from a huge imbalance in the amount wagered. This second bookmaker that is used by the bookmaker to "lay-off" or "hedge" bets is referred to commonly as the "hedge office." I know from my experience and training that both methods will involve a significant amount of telephone activity.

14.     Furthermore, there is a code used by bettors to indicate how much is being bet at a particular instance. Instead of calling and stating, "I'll bet one hundred dollars on New York," bettors will for example, say, "Jets, twenty times." ( A "time" bet is computed by multiplying the number stated by five to get the amount bet. In the instance cited above, the bet placed would have been for one hundred dollars.) In other examples of gambling language, a "nickel" is $500; a "dime" is $1,000; and a "dollar" is $100. The term "little dollars" refers to a bet for that number of dollars, e.g., "twenty little dollars" is, actually, a wager for twenty dollars.

15.     The betting week in a typical illegal gambling operation runs from Monday through Sunday, and "settling up" occurs the following Monday. The results of the betting for the week are calculated by either the bookmaker or another wireroom employee. A "figure" is arrived at on Monday which represents the amount of money the bettor owes the bookmaker or the bookmaker owes the bettor as a result of the previous week's betting

10

activity. The "figures" are kept by the bookmaker on a weekly reconciliation sheet, a sheet of paper which shows the weekly figures for all the individual bettors under all the runners' accounts. During the course of the next few days, the bettor must then "settle up" with the bookmaker, that is, either collect from or pay to the bookmaker the figure owed. As noted above, the runner is in many instances responsible to the bookmaker for collecting money from losing bettors in his account, and will, in many instances, settle up with the bookmaker

16. A betting line is used by bookmakers and applied towards a sporting contest, in an attempt to compensate for disparate levels of ability in two teams. The "line" on a football game will typically include the number of points by which one team would have to beat the other in order for the bettor to win, e.g., a "line" of "the Jets minus three" would mean that, in order for the bettor wagering on the New York Jets professional football team to win, the Jets would have to win the game by more than three points.

17. This betting line can be crucial to the ability of the bookmaker to earn a profit from this gambling activity. Because there is a minimum 10% surcharge on all losing wagers, a bookmaker in many cases will balance the amount bet on each of two teams in a given sporting event, since this assures him of a risk-free profit of at least ten percent.

18. During the course of a betting day, "runners" and individual bettors will normally call the wireroom for the betting line, and will thereafter place bets. If more money is bet on one team than the other in a particular sporting event, the bookmaker risks losing money if the team with money bet on it wins. To prevent this, a bookmaker can do two

11

things. First, he can alter the betting odds, that is, he can change the "line" so as to encourage subsequent bettors to bet on the team on which less money is being wagered. In the example given above, if more bettors are betting on the New York Jets football game at odds of "minus three," the bookmaker can respond by raising the odds to "Jets minus 5." This means that those who bet on the Jets would need to have New York win by more than five points in order to collect. This change in the odds would encourage subsequent bettors to wager on the Jets' opponents, thus moving towards the balance in the amount bet.

19.     Moreover, during the course of the betting day, the wireroom boss is responsible for keeping the "accountant office" up to date with all of the betting activity occurring in the wireroom. This "accountant office" is off-site and is manned during betting hours. An individual referred to, in my experience, as an "accountant" is in charge of this off-site location and is responsible for obtaining information from the wireroom boss and tallying up the money figures for each individual bettor in the wireroom. This information usually consists of one copy of the three-ply carbon sheets used at the wireroom to record bets. The accountant may obtain this information by fax or in person or, in some cases, the wireroom boss can tell the accountant the information over the telephone and give him copies of the betting sheets at the end of the night. Regardless of the method, the information must be relayed throughout the day from the wireroom boss to the accountant. This is done to prevent the loss of all of the betting records of the wireroom for that day in case of law enforcement action.

12

20.     Once the "accountant" tallies this information, he passes it on to a "middleman." The "middleman" is a liaison between the "accountant" and the bosses of the gambling operation. It is his job to take this information to the bosses so that they are aware of the amounts bet by every wagering individual in their wirerooms, their profits, and their losses during the betting day. This allows the bosses to change orders given to the wireroom bosses, including limiting the ability of certain individuals to place wagers and limiting the amount of wagers taken by the wireroom on a specific event. The middleman is usually a trusted associate of the bosses of the operation. This is because only the middleman knows the identities of the bosses, the accountant, and the wirerooms, including the number of rooms and the number of bettors in each room. Moreover, he is entrusted by the bosses with the money to pay off all winning bets and all employees of the gambling operation, as well as with making sure that the wireroom bosses follow the orders of the bosses of the gambling operation. The presence of a middleman in a gambling operation also serves as a buffer between the wirerooms, the accountant, and the bosses. The wireroom boss is usually unaware of the identities of the bosses of the entire gambling operation. The middleman's job is to protect the identity of these bosses by dealing directly with the accountant, and if necessary, the wireroom bosses himself. Thus, should the wireroom be compromised, the bosses of the operation would not be in danger of being identified.

13

## BACKGROUND OF THE INVESTIGATION

21.     In October, 1999, I received information from the Orange County District Attorney's Office regarding an illegal gambling operation being conducted in Orange County, and elsewhere within the State of New York.

22.     Specifically, I was informed that an individual by the name of Christopher Colombo of 51 Horton Road, Town of Washingtonville, County of Orange, State of New York, controls a gambling operation in Orange County and elsewhere within the State of New York. A check with the New York State Division of Criminal Justice Services ( hereinafter "DCJS") disclosed that in 1995, Christopher Colombo (date of birth 10-24-61) of 51 Horton Road, Town of Blooming Grove, County of Orange, was arrested in the Town of Middletown, also in Orange County, for Possession of Gambling Records in the First Degree. In 1996, he pled guilty to Promoting Gambling in the Second Degree, a Class A misdemeanor, and received a $1000 fine. Christopher Colombo is the son of the late Joseph Colombo, Sr., past boss of the Colombo organized crime family in New York.

23.     I am informed by Joseph Rauchet, Duputy Chief Investigator of the Organized Crime Task Force that Anthony Colombo is listed by the Federal Bureau of Investigation as a "made" member of the Colombo Family, one of the five "mafia" families operating in the New York City metropolitan area, and that Anthony Colombo is also the son of the late Joseph Colombo, Sr., for whom this mafia family is named.

14

24.     Rauchet has been the Deputy Chief Investigator for the Organized Crime Task Force of the New York State Attorney General's Office (hereinafter "OCTF") since December 1996. During that time, he has supervised numerous investigations concerning organized criminal activity and "La Cosa Nostra," i.e., the Mafia. Prior to his employment with OCTF, he served as a Detective with the New York City Police Department ("NYPD") for more than twenty-seven years. Between 1982 and 1995, he was assigned to the Richmond County District Attorney's Squad where he conducted several Mafia investigations, two of which resulted in convictions of members of the Bonanno Crime Family and the Gambino Crime Family for violations of the New York Organized Crime Control Act (Penal Law Article 460). He has listened to over 20,000 conversations intercepted pursuant to court-authorized wiretaps discussing Mafia matters. He has also extensively debriefed members of three different Mafia families about organizational characteristics, rituals and criminal activities of the families. He has provided expertise about the Mafia to Italian, Russian and German investigators, prosecutors and judges. Furthermore, he has testified as an expert on the Mafia in New York State Supreme Court trials and in New York State and Federal grand juries. Finally, his Mafia expertise has been acknowledged by the Appellate Division, Second Department. See People v. Barone, 221 A.D.2d 553 (2nd Dept. 1995). Through his experience of investigating the Mafia for over fifteen years, he has acquired extensive knowledge of the hierarchy of the five Organized Crime families based in the New York City area, the identity of many of the current members of the five families and the roles these members play within the

15

hierarchies.  He has also acquired extensive knowledge of the Mafia's organizational structure, language, customs and traditions.

25.    I have recently confirmed Rauchet's information through my discussions with FBI agents, who have also confirmed for me that Christopher Colombo and Philip Dioguardi are both "associates" of the Colombo La Cosa Nostra (or "LCN", another designation for the mafia, used commonly by federal law enforcement authorities).

26.    Based upon my conversations with Rauchet, I am informed that a mafia or LCN family has the following structure: the Boss, who acts as the CEO of the family, with final authority within the family to settle disputes, and to whom the other members of the family provide a portion of their illegal earnings; the Underboss, second in command to the Boss;  the Consigliere, a counselor to the Boss and Underboss on family matters and on interactions with other LCN families; Captains or Capos, who act as mid-level management, overseeing the activities of the soldiers and associates who report to them; Soldiers, the lowest title for persons who are actually inducted into the LCN family; and Associates, who are persons who are not inducted or "made" members of the LCN family, but who nevertheless participate in the illegal businesses of the family.  Some Associates may be such good "earners" for the family, or be so trusted, that they gain direct access to mid-level or upper-level management of the family, if the Boss permits it.

27.    As noted in my incorporated affidavit dated May 1, 2000, and submitted in support of an application for pen registers and trap and trace devices, since October, 1999, members of the NYSP ("investigative team") have observed Philip

Dioguardi frequently in the vicinity of First Avenue and 115th Street in Manhattan meeting with the male tentatively identified as John Ferrara in the vicinity of Ferrara's home, 420 East 115th Street. Moreover, as noted in the incorporated affidavit of Assistant Deputy Attorney General Meryl A. Lutsky, dated June 15, 2000, and submitted in support of a pen register and trap and trace device, surveillance, information obtained from agents of the FBI, and analysis of telephone toll records and pen register data revealed that Ferrara frequented a gambling wireroom located at 333 East 116th Street and, during that same time period, had extensive telephone contact with Dioguardi's cellphone and home telephone lines listed above.

        28.    A computer check with DCJS revealed that Dioguardi has been arrested at least 5 times in New York, most recently in Kings County in 1973 for Promoting Gambling (the disposition of this case does not appear on his DCJS record). Dioguardi has two additional arrests in California, for narcotics and assault offenses. I am informed by agents of the FBI that Dioguardi was with Joseph Colombo, Sr., when he was shot in 1971. The investigative team has observed Dioguardi arriving in the vicinity of East 115th Street and First Avenue with either Anthony Colombo or Christopher Colombo. Moreover, a check with the New York State Department of Motor Vehicles and New York State licensed telephone and telecommunications companies reveals that Christopher Colombo, Anthony Colombo, and Philip Dioguardi do not live in New York County, but live at the above-listed addresses. Further, surveillance conducted by members of the NYSP and the FBI confirms that the three all reside in Orange County and do not have residences in New

York County. These same record checks and surveillance, as noted in the June 15, 2000, pen register application and affidavit's is support thereof, reveal that the individual tentatively identified as John Ferrara resides in New York County at 420 East 115th Street. A further check with DCJS revealed that Anthony Colombo was convicted in federal court in 1986 of violating the RICO statute and sentenced to fourteen years incarceration. He was released from federal prison in 1993.

29.     While conducting surveillance in the vicinity of 115th Street and First Avenue, New York County, the investigative team has observed one or more of the three meeting on the street with convicted gamblers Gaetana Cirillo, Robert Milano, Rinaldo Nistico, Anthony DeFranco, and Daniel Pagano.[4] I am informed by Rauchet that Pagano is a soldier in the Genovese Mafia Family. Based upon my experience in investigating gambling-related crimes, it is my opinion that these meetings, all in the vicinity of the above-mentioned gambling wireroom, indicate that Christopher Colombo, Anthony Colombo, Philip Dioguardi, and John Ferrara are engaging in gambling-related criminal conduct. This is based on the fact that only Ferrara lives near the wireroom, that none of the four men have been observed by the investigative team as being legitimately employed and certainly no employment-related reason to be near the wireroom, that the wireroom has been identified by the FBI as one of many in this gambling prone location, and that

_____

[4]     For more details regarding the criminal records of these individuals, see the affidavits in support of the applications for pen registers and trap and trace devices, dated May 1, 2000, and June 15, 2000. Moreover, the gambler earlier identified in those affidavits as John Berlingieri may, in fact, be John Ferrara.

Christopher, Anthony, and Philip have not been seen by the investigative team conducting any legitimate business there. The investigative team also conducted surveillance at the homes of the above-mentioned targets. These surveillance revealed that Philip Dioguardi was at the home of Christopher Colombo numerous times a week. As noted above, Dioguardi was also observed by the investigative team meeting with the male identified as John Ferrara on 115th Street in Manhattan, on several occasions.

30.    I also began an analysis of the telephone records of the above-named targets.    These records were obtained for the above-mentioned telephone lines and instruments for the time periods of approximately December 1999, through March 2000. A check with Bell Atlantic Wireless (now Verizon Wireless) telephone company revealed that the cellular telephone currently assigned telephone number (914) 443-8182, bearing electronic serial number 17904462477, is subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2 East Main Street, Number 4, Town of Middletown, County of Orange, State of New York (hereinafter "Dioguardi cell phone"). Moreover, a check with DPI/TFS Incorporated (now Frontier Communications) telephone company revealed that the telephone line and instrument currently assigned telephone number (914) 496-6506, is subscribed in the name of Lucille Colombo and located at 51 Horton Road, Village of Washingtonville, Town of Blooming Grove, County of Orange, State of New York (hereinafter "Christopher Colombo home phone").    The investigation has revealed that Lucille Colombo is the mother of Christopher Colombo.    A check with DPI/TFS Incorporated (now Frontier Communications) also revealed that the telephone line

19

and instrument currently assigned telephone number (914) 496-8201 is subscribed in the name of Anthony Colombo and located at 25 Horton Road, Town of Blooming Grove, County of Orange, State of New York (hereinafter "Anthony Colombo home phone"). Furthermore, a check with Citizens Telecom telephone company reveals that the telephone line and instrument currently assigned telephone number (914) 343-3313, is subscribed in the name of Philip Dioguardi and located at 2 East Main Street, Town of Middletown, County of Orange, State of New York (hereinafter "Dioguardi home phone"). Finally, a check with Bell Atlantic telephone company reveals that the telephone line and instrument currently assigned telephone number (212) 410-7444, is subscribed in the name of Theresa Ferrara and located at 420 East 115th Street, 3rd floor, apartment 3, County of New York, State of New York (hereinafter "Ferrara phone").

   31. This analysis of telephone toll records revealed that the above-listed individuals were in constant telephonic contact with one another during this period.[5] Specifically, there were 29 calls made between the Dioguardi cell phone and the Anthony Colombo home phone. Further, there were 66 calls between the Christopher Colombo cell phone and the Dioguardi cell phone, 53 calls between the Christopher Colombo cell phone and the Dioguardi home phone, and 47 calls between the Christopher Colombo cell phone and the Anthony Colombo home phone. Additionally, the Christopher Colombo home

---

   [5] For a more detailed discussion of these telephone records, see my affidavit in support of an application for pen registers and trap and trace devices, dated May 1, 2000, and the affidavit of Assistant Deputy Attorney General Meryl Lutsky in support of an application for a pen register and trap and trace device, dated June 15, 2000.

phone was used to place 42 calls to the Dioguardi home phone. Also, the Anthony
Colombo home phone was used to place 23 calls to the Dioguardi home phone.

32. The telephone records also revealed numerous telephone calls
occurring between the Ferrara telephone and the rest of the subject telephone lines during
this period. For example, approximately 106 telephone calls were made to the Ferrara
phone from Dioguardi's cell phone; sixteen telephone calls made from the Ferrara phone
to Dioguardi's cell phone; fifty-nine telephone calls made to the Ferrara phone from
Dioguardi's home phone; two telephone calls to the Ferrara phone from the gambling
wireroom located at 333 East 116th Street (updated telephone records from Bell Atlantic
revealed two more telephone calls from the gambling wireroom to the Ferrara phone on
April 15, 2000); two telephone calls from the Ferrara phone to the home phone of Anthony
DeFranco; and two telephone calls from the Ferrara phone to Anthony Colombo's home
phone. These frequent and consistent telephone contacts between the targets' telephone
lines and between the Ferrara telephone and the telephone lines of Philip Dioguardi, as
well as the more limited contact between the Ferrara telephone and the telephone lines of
Christopher and Anthony Colombo are consistent, in my experience, with bookmaking
practices where the individual in charge of the wireroom (which based on my telephone
analysis, FBI information, and surveillance, is Ferrara), is constantly called upon to report
the day's debt collections and the wireroom's progress to the middleman (which based on
the investigation is Dioguardi) and in some case, to the boss, the Colombo brothers.

33. It is my opinion, based upon my experience in this investigation and
my experience in gambling-related investigations, that Philip Dioguardi is using the above-

21

mentioned cellular telephone assigned telephone number (914) 443-8182, as well as the telephone line currently assigned telephone number (914) 343-3313 to engage in gambling-related activities. It is also my opinion based on my experience in this investigation, that Christopher Colombo is using the telephone line currently assigned telephone number (914) 496-6506 to engage in gambling-related activities and that Anthony Colombo is using the telephone line currently assigned telephone number (914) 496-8201 to do the same. Moreover, based upon my training and experience in the area of illegal bookmaking, it is my opinion that bookmakers commonly utilize telephone lines not subscribed and/or billed in their own names in order to escape possible law enforcement detection.

34. On May 1, 2000, the Honorable Daniel W. Joy, Justice of the Supreme Court of the State of New York, Appellate Division, Second Department, issued an Order authorizing the installation and use of pen registers and trap and trace devices (Caller ID) on the cellular telephone line and the telephone lines and instruments assigned the following telephone numbers: (914) 443-8182, bearing electronic serial number 17904462477, subscribed in the name of Anthony Colombo and billed in the name of Philip Dioguardi, 2 East Main Street, Number 4, Town of Middletown, County of Orange, State of New York; (914) 496-6506, subscribed in the name of Lucille Colombo and located at 51 Horton Road, Town of Washingtonville, County of Orange, State of New York; (914) 496-8201, subscribed in the name of Anthony Colombo and located at 25 Horton Road, Town of Blooming Grove, County of Orange, State of New York; (914) 343-3313,

22

subscribed in the name of Philip Dioguardi and located at 2 East Main Street, Town of Middletown, County of Orange, State of New York; and (917) 560-0397, bearing electronic serial number 316010009486930, subscribed in the name of Jeffrey Rosen, 1444 11th Street, Fort Lee, New Jersey.

35.     An analysis of pen register data compiled from approximately May 1, 2000,[6] revealed that the above-mentioned frequent and consistent telephone contact between the subjects of the investigation continued. During the seven weeks beginning May 1, 2000, approximately 107 calls were recorded between the Dioguardi cell phone and the Ferrara phone. Of these, 105 were from the Dioguardi phone to the Ferrara phone. Thirty-three of the calls went unanswered. There was only one call recorded on a Sunday during this period. Otherwise, Dioguardi called the Ferrara telephone at least once a day, and sometimes up to five and six times a day, during the week. Forty-four additional telephone calls were made to the Ferrara phone from the Dioguardi home phone.

36.     This analysis also revealed approximately twenty-six telephone calls between the Dioguardi cell phone the Christopher Colombo home phone. All twenty-six telephone calls were made from Christopher Colombo's telephone line to Philip Dioguardi's cellphone, and all but two of the twenty-six telephone calls occurred between 12:27 p.m. and 6:30 p.m. Moreover, in the morning on several occasions during this period, the surveillance team has observed a car registered to Philip Dioguardi parked in Christopher

_____

[6]      The court-authorized pen registers and trap and trace devices became active with regard to these telephone lines as follows: (914) 443-8182 on May 1, 2000; (914) 496-6506 on May 8, 2000; (914) 496-8201 on May 8, 2000; (914) 343-3313 on May 5, 2000; and (917) 560-0397 on May 1, 2000.

23

Colombo's driveway. This behavior of meeting in the morning, as well as the timing of these calls (all but one of which occurred on a weekday) is consistent with the behavior of a boss of a gambling operation meeting with and checking on the status of a gambling wireroom with a subordinate during the day to make sure everything is running smoothly.

37. Another twenty-four telephone calls were recorded between the Dioguardi cell phone and the Anthony Colombo home phone. Seven of these calls were from Anthony Colombo's telephone line to Philip Dioguardi's cellphone and seventeen were from Dioguardi to Colombo. Four of the twenty-four telephone calls went unanswered. This reveals, in my opinion, that Anthony Colombo is involved in the gambling operation as well. This opinion is bolstered by the fact that the surveillance team has observed a car registered and driven by Dioguardi in Anthony Colombo' driveway as well as Christopher's, during this period, including on, June 23, 2000, when Dioguardi's car was in Anthony Colombo's driveway for several hours, beginning at approximately 11:00 a.m. In fact, surveillance during this period reveals that Dioguardi stops at either Christopher or Anthony Colombo's house either before or after his daily ride to New York City. The timing of the telephone calls, early in the morning and late at night, reveals to me that Dioguardi is discussing the day's activities with the Colombos and seeing if they have any specific instructions for him.

38. Twelve other calls were recorded between the Dioguardi home phone and the home telephone of Joseph Colombo, Jr., currently assigned telephone number (914) 496-3951, and located at 125 Jackson Avenue, Town of New Windsor, State of New York. Joseph Colombo, Jr., is brother to both Christopher and Anthony Colombo and is

24

listed by the FBI as a "made" member and soldier in the Colombo organized crime family. The FBI also lists Joseph Colombo, Jr., as sometimes acting as the Capo of the crime family. Joseph Colombo, Jr., has been previously convicted of Federal RICO charges resulting in his incarceration. Eighteen more calls were recorded between Dioguardi's cell phone and Joseph Colombo's home telephone. Dioguardi received one call over his cell phone from the telephone line and instrument currently assigned telephone number (917) 846-6600. I am informed by Verizon Wireless that this telephone number, (917) 846-6600, is subscribed in the name of Joseph Colombo and billed to the above address. Dioguardi called this number twice from his cell phone. Furthermore, Dioguardi placed one call from his cell phone and one call from his home phone to the telephone line and instrument currently assigned telephone number (914) 213-8800. I am informed by Verizon Wireless that this telephone number is also subscribed in the name of Joseph Colombo. This telephone number is billed to P.O. Box 157, Cornwall, New York. The fact that Joseph Colombo, Jr., has two different cell phones billed to two different addresses and the fact that almost all of the calls associated with him are made over his home phone, reveals, in my opinion, that he uses each cell phone for a distinct criminal activity.

39.    Other telephone calls recorded during this period show that the Dioguardi telephones are being used in furtherance of gambling-related crimes. For example four telephone calls were recorded between Dioguardi's cell phone and the telephone line and instrument currently assigned telephone number (914) 639-3150, subscribed in the name of Rhonda Sobel and located at 90 North Main, New City, New York. I have been informed by the Rockland County District Attorney's Office that Ira Sobel

25

is a bookie known to that office and that Sobel runs a bowling alley at 90 North Main, New City, New York. Again, this reveals, in my opinion, that Colombo and Dioguardi are dealing with several bookmakers and bookmaking operations at one time. Another eighteen calls were recorded during this period between the Dioguardi home phone and the telephone line and instrument currently assigned telephone number (760) 328-7377, listed to Russell Artuso, Cathedral City, California. I have been informed by a senior investigator from the Riverdale District Attorney's Office in Riverdale, California, that Artuso is a bookmaker known to that office.

40. Other telephone calls recorded during this period show that the Christopher Colombo home telephone line is being used in furtherance of gambling-related crimes. For example, four calls were recorded between this telephone line and the telephone line and instrument currently assigned telephone number (914) 783-3964, listed to Edward Robinson and located at 3 and one-half Mangin Road, Town of Monroe, State of New York. A check with DCJS reveals that Robinson has been arrested for bookmaking in the past and was in fact arrested with Christopher Colombo in a gambling wireroom. A call was also recorded between the Dioguardi home phone and Robinson during this period. These calls reveal, in my opinion, that Christopher Colombo and Philip Dioguardi deal with more than one bookmaker at a time.

41. Four other telephone calls were recorded during this period between the Christopher Colombo home phone and the telephone line and the telephone line and instrument currently assigned telephone number (914) 782-5934, listed to Little Italy Delicatessen, and located at 9 Federal Plaza, Town of Monroe, State of New York. I have

received confidential informant information that an individual named Leo Caldera is collecting gambling debts for Christopher Colombo. Surveillance teams have observed Caldera in and about this small delicatessen for over an hour, walking in and out, before leaving empty-handed. As noted below, both Anthony Colombo and Philip Dioguardi have also called this delicatessen during this period. Another five calls were recorded during this period between Christopher Colombo's home phone and the telephone line and instrument currently assigned telephone number (914) 369-7138, subscribed in the name of Gina Devito and located at 81 Cherry Lane, Monsey, New York. I have been informed by the Rockland County District Attorney's Office, that Gina Devito is the wife of Daniel Pagano and that their records reveal both Devito and Pagano live at 81 Cherry Lane. As noted in paragraph 27, above, one or more of the targets have been observed meeting with Pagano in the vicinity of 115th Street and First Avenue.

42.    The home telephone line of Anthony Colombo, as noted above, is also in constant and frequent contact with both Philip Dioguardi's cell phone and Christopher Colombo's home telephone line. Moreover, as noted immediately above, there has also been telephone contact between the Little Italy Delicatessen and Anthony Colombo's home telephone line. During this period, eight telephone calls were recorded between the two telephone numbers, six from the Anthony Colombo home phone to the Deli and two from the Deli to the Anthony Colombo home phone. An analysis of these calls reveals that the two were in contact more than once on three separate days. The pen register data also shows that Anthony Colombo placed a telephone call to the Ferrara telephone during this

27

period. This reveals, in my opinion, that Anthony Colombo is intimately involved in the running of the gambling operation.

43.     The pen register data also shows telephonic contact between the Dioguardi phones and the Ferrara phone. Moreover, the surveillance team continued to observe Dioguardi in the vicinity of 115th Street and First Avenue, Manhattan, during this period. On June 26, 2000, for example, the team observed Philip Dioguardi in his car double parked in front of 420 East 115th Street. In the car with Dioguardi was John Ferrara. They were observed at approximately 12:00 p.m., talking with a third and unidentified male who was standing outside the car. Ferrara and Dioguardi then pulled away from 420 East 115th Street in the car, drove down the block and stopped in front of a bodega at the corner of First Avenue and 115th Street. Ferrara got out of the car and entered the bodega. He emerged approximately one minute later empty handed and returned to the car. Dioguardi then drove Ferrara to a building on 116th Street between numbers 401 and 405. Ferrara again got out of the car, entered the building, emerged minutes later empty handed, and returned to the car. Dioguardi then drove Ferrara back to 420 East 115th Street. Ferrara got out of the car and entered the building. Dioguardi drove away and was followed by the surveillance team as he drove straight to Christopher Colombo's house, via New Jersey. It is my opinion that Ferrara was conducting business with Dioguardi by checking on gambling locations for him and letting him know their condition, which explains why he was not carrying gambling paraphernalia or proceeds, before Dioguardi reported to Christopher Colombo. These frequent and consistent

28

telephone contacts between the Ferrara telephone and the telephone lines of Philip Dioguardi are consistent with bookmaking practices.

44. Moreover, an analysis of the pen register data for this period reveals that all of subjects of this investigation, Philip Dioguardi, Christopher Colombo, Anthony Colombo, and Theresa Ferrara, were in telephonic contact with the telephone line and instrument currently assigned telephone number (718) 299-2242, subscribed in the name of Sarbens Furniture Corp., and located at 814 East Tremont Avenue, Bronx, New York. Telephone toll records reveal calls dating back to October 1999. All 132 calls, dating from October 20, 1999, through January 17, 2000, were from Christopher Colombo's home phone and cell phone. After January 17, 2000, no more calls were placed to Sarbens from Christopher Colombo's home phone. However, after January 17, 2000, nine calls were placed to Sarbens by the Dioguardi phones and nine calls were placed to Sarbens from Ferrara as well as Colombo. These calls, sometimes up to six times a day, every day, reveal, in my opinion, that Sarbens Furniture is a location where a gambling operation can "lay-off" their bets, as described in detail above, and that originally Christopher Colombo, himself, was doing all of the lay-off work.

45. However, the pen analysis revealed that as time went on, all members of the gambling operation had the duty and the permission to call Sarbens. During this initial pen register period, there were thirty-two calls made to Sarbens from Dioguardi's cellphone, seven calls made from the Dioguardi home phone, fifteen calls made from Christopher Colombo's home phone, and one call made to Sarbens from Anthony Colombo's home phone. The opinion that Sarbens is a policy location is bolstered by the

29

investigative team's surveillance of the location. The location is a small storefront, approximately thirty feet wide. Directly inside the single front door, is a man seated behind a desk. Furniture inside the location is all covered with plastic and there is a hallway that extends back towards an office. It has been my experience that storefronts like Sarbens are used for policy and numbers operations in the back out of sight and that a sentry is posted at the door. This is consistent with the investigative team's surveillance which revealed a man at the door and did not look like furniture was on display for sale.

46. A further review of telephone calls made from the Christopher Colombo home telephone reveals approximately five telephone calls during this period to the telephone line and instrument currently assigned telephone number (914) 779-3899, subscribed in the name of Juanita Margulies and located at 4 Sadore Lane, Yonkers, New York. Numerous calls had been recorded on telephone toll information prior to the pen register period. I am informed by Detective Michael McGee of the New York City Police Department's Bronx Homicide Squad that Juanita Margulies is the wife of Raymond Margulies and that Raymond Margulies owns RAM Furniture store on East Tremont Avenue. Detective McGee further informed me that he was investigating the homicide of an individual named Caeser Mollo who had been shot to death several years ago. The retired New Rochelle police officer who was convicted of the killing told police that he shot Mollo because he owed Mollo $35,000 in gambling debts and could not pay. In Mollo's pocket, police found a check made out to Christopher Colombo from RAM Furniture store on East Tremont Avenue. When police interviewed Raymond Margulies, he stated that

30

Colombo was an outside furniture salesman for him and that the check was for commissions earned by Colombo in such furniture sales.

47. In over ten months of investigating this case, the surveillance team has never observed Christopher Colombo possessing, selling, driving with, or moving any furniture. Nor have they seen those closest to Christopher, namely Anthony and Philip Dioguardi have anything to do with the furniture business. In fact, throughout all of the surveillance of Christopher in New York City, the team has never seen him even once visit RAM Furniture on East Tremont Avenue. Moreover, a review of the telephone toll records for the Christopher Colombo phone do not reveal any evidence of furniture sales related calls such as initial calls to numerous businesses and homes. In fact, a review of Sarbens Furniture's telephone toll records for the above-mentioned telephone line reveal that this line received approximately thirty-five telephone calls from Sarbens Furniture store during the first two weeks of the pen register period. Based on the above, it is my opinion that RAM is another one of Christopher Colombo's policy and "lay-off" operations, that Mollo used to work for such operation, and that the check found in Caeser Mollo's pocket was to be used to pay Colombo his profit in the gambling operation's take for the week from the RAM location.

48. In conclusion, my analysis of the pen register data revealed that the subjects of this investigation remained in frequent and consistent contact with one another through the use of the above-mentioned telephone lines. On any given day during this period, the patterns of these calls are clear. For example, on June 17, 2000, Dioguardi called Ferrara, then Christopher, then Sarbens all within two hours. He then called

Sarbens back, then Ferrara back, and ultimately called Christopher back, again all within a few hours. This reveals, in my opinion, that Ferrara is in constant contact with Dioguardi and that Dioguardi constantly reports to Christopher Colombo the day's progress as it is happening. That same day, June 17, 2000, about an hour after the above calls were made, Dioguardi called Ferrara, then Christopher, then Joseph Jr., then Anthony. This shows that all of the Colombo brothers are being kept up as to how the day is going and that they are all involved in the gambling operation. One week later, on June 26, 2000, the same patterns emerge; Dioguardi calls Ferrara, Anthony, Sarbens and Christopher. The next day, Anthony calls Christopher, Christopher calls Dioguardi, and Dioguardi calls Ferrara before calling Joseph Jr. This constant contact among and between the parties all day long reveals that they are all involved in the illegal conduct and are using the above-mentioned telephone lines to keep track of the gambling operation.

49. Additionally, during this period, the investigative team developed a confidential informant. This informant owed gambling debts to a wireroom in Orange County[7]. The informant stated that he paid these gambling debts to an individual the informant knew as Paul Seipman. The informant paid Seipman inside a private house located at 145 Clinton Street, Village of Montgomery, Town of Montgomery, County of Orange, State of New York. A check of telephone company records, records from the New York State Department of Motor Vehicles, and surveillance by the investigative team confirmed that Paul Seipman lived and ran a tax business, Orange County Tax Service,

[7]     This wireroom is referred to as the Zollner wireroom in the May 1, 2000, affidavit in support of an application for pen registers and trap and trace devices.

at the above-listed address. The informant stated to me that Seipman informed him that Christopher Colombo was the head of the gambling operation. This information was corroborated by the Orange County District Attorney's Office and my analysis of telephone usage records. These telephone records reveal telephone calls between the home and cellular telephone of Christopher Colombo noted above and Seipman's business and home telephone lines and instruments, currently assigned telephone numbers (914) 457-4156, subscribed in the name Paul Seipman and located at 145 Clinton Street, Montgomery, New York; and (914) 457-3348, subscribed in the name Orange County Tax Service and located at the same address. The telephone records also reveal a call from the Dioguardi home phone to the Seipman business during this period.

50. During the month of May, 2000, I provided the informant with a tape recording device, which was placed on his person, to enable him to record a conversation he stated that he was going to have with Seipman regarding his gambling debt. After providing the informant with the recording device, the investigative team observed the informant enter 145 Clinton Street. The informant told me that he then had a conversation with Paul Seipman and gave him a sum of U.S. currency which had been provided by the New York State Police. During this recorded conversation, in which the informant called the male he spoke to and identified as Seipman, "Paul," the informant asked Seipman "what's my figure to you right now?" The use of the term "figure," in my experience, means the dollar amount a debtor owes on his gambling debt. Seipman told the informant what he owed and the informant then asked Seipman to "refresh my memory" on the amount.

The informant told me that as Seipman responded, stating "this is you," he showed the informant a sheet of paper and pointed to one line.

51.     As noted in the incorporated affidavits, dated May 1, 2000, and June 29, 2000, based upon my years of experience investigating gambling related crimes and both examining and analyzing paperwork kept by those involved in gambling activities, I have learned that betting individuals are given a number by the person responsible for their debts in order that the boss, in this case Christopher Colombo, of the gambling enterprise can identify the middleman, in this case Seipman, by a single bettor's number and can easily identify all bettors for whom an individual middleman is responsible. Any bettor with a identification number in the 500's would be one middleman's responsibility, any gambler with a number in the 600's another middleman's responsibility, and so on. It is my opinion that the informant saw the list of bettors that Seipman is responsible for and that this shows that Seipman is, in fact, a middleman for a gambling operation. This sighting, coupled with the fact that four telephone calls between Christopher Colombo's home telephone and Seipman's business and home phones were recorded prior to the informant's first recorded conversation with Seipman and four more telephone calls were recorded from Christopher Colombo's home telephone to Seipman's home and business telephone lines between May 1, 2000, and June 29, 2000, reveals that Christopher Colombo does not usually deal with middlemen directly but that he has their telephone numbers and can reach them to talk about the operation if necessary.

52.     The informant stated to Seipman, "you got it by year," indicating that the records were kept on a yearly basis. Seipman went on to say that his "fiscal year"

34

"starts September 1st." Based on my experience, the traditional gambling operation's year begins on September 1st, with the advent of the professional football season. Thus is due to the fact that professional football is the sport wagered on by more bettors using more money than any other sport. This is corroborated by another conversation the informant had with Seipman which was also recorded and is discussed below. In that conversation, Seipman told the informant that "I don't like baseball as much as I used to" and that "football is the big thing." Moreover, it has been my experience through my analysis of thousands of gambling records that many gamblers wager only during the football season and that extra bettors appear on such records in the highest quantity during football season. The fact that the records are kept in this manner reveals to me that Seipman is part of a long-standing and well-organized gambling operation. This opinion is corroborated by Seipman's discussion with the informant regarding the informant's gambling debt "two years ago" and Seipman's statement to the informant that he will "keep track of" the payments made by the informant on the old debt.

53. Approximately one month later, the informant again was provided with a tape recording device and proceeded to 145 Clinton Street. The informant entered the location and informed me that he again had a conversation with Paul Seipman regarding his gambling debt. Again Seipman responded when the informant called him "Paul." During this conversation, Seipman told the informant that he is "in the hole" and "out a lot of money." It is my opinion, that these comments by Seipman refer to the fact that he is personally liable for and has paid out the amount of money owed to him by bettors he is responsible for to the gambling organization. This is consistent in my experience, with the

35

way in which an organized gambling operation collects on its debts whereby a bookmaker is responsible for paying all bettor debts to the accountant within a few days of the bet whether or not the individual bettors have made good on their debts. Thus, even if a bettor has not paid his debt, the bookmaker must pay it for him and then collect from the bettor himself. This insures that the accountant, middleman, and boss of the gambling operation not only are kept in the green with the constant payment of debts but are also kept from being identified as they seek payment by an individual bettor.

54.    As noted above, On June 15, 2000, the Honorable Eugene Nardelli, Justice of the Supreme Court of the State of New York, Appellate Division, First Department, issued an Order for a Pen Register and Trap and Trace Device authorizing the installation and use of a pen register and trap and trace device (Caller I.D.) on the telephone line and instrument assigned telephone number (212) 410-7444, subscribed in the name of Theresa Ferrara and located at 420 East 115th Street, 3rd floor, apartment 3, County of New York, State of New York. Two weeks later, on June 29, 2000, the Honorable Sondra Miller, Justice of the Supreme Court of the State of New York, Appellate Division, Second Department, issued an Order Extending the use of Pen Registers and Trap and Trace Devices on the Colombo and Dioguardi telephone lines.

55.    Since these dates, the above-mentioned frequent and consistent telephonic contact among and between the targets of the investigation has continued. An analysis of the pen register data over the past seven weeks reveals approximately eighty-three calls were recorded between the Christopher Colombo home phone and the Anthony Colombo home phone during this period. The brothers seemed to call each other almost

36

every day and even several times in one day, during this period. Moreover, approximately twenty-six calls were recorded between the Christopher Colombo home phone and the home phone of Philip Dioguardi with twenty-five of those twenty-six from Colombo to Dioguardi, as many as four times a day. An additional forty-three calls were recorded between the Christopher Colombo home phone and the Dioguardi cell phone, eighteen of which were placed by Colombo to Dioguardi. The great majority of these calls were made between the two in the afternoon and included six days on which the two spoke by phone at least two times over the phone.

     56. Dioguardi also continued to use the above-captioned telephone lines to keep in contact with Anthony Colombo's home phone during this period. Twenty calls were recorded between the Dioguardi home phone and the Anthony Colombo home phone, fifteen of which were to Colombo from Dioguardi. Another thirty-one calls were recorded between the Dioguardi cell phone and the Anthony Colombo home phone, eighteen of which were made from the Dioguardi cell phone to the Anthony Colombo home phone. On nine different occasions, the two spoke at least two times during the day, with one instance July 21, 2000, where the two spoke five times in the span of three hours. An analysis of the calls recorded between the Dioguardi telephones and the home phones of both Christopher and Anthony Colombo reveal, in my opinion, that both Christopher and Anthony Colombo rely on Dioguardi throughout the day to keep them informed about this gambling operation and that they discuss the information they get from Dioguardi with each other in order to determine a course of action.

37

57.     This opinion is bolstered by the fact that during the same period thirty-six calls were recorded from the Dioguardi home phone to the Ferrara phone and thirty-nine more calls were recorded from the Dioguardi cell phone to the Ferrara phone. Only two calls were recorded during this period coming from the Ferrara phone to Dioguardi's cell phone. An analysis of these calls reveals, in my opinion, that Dioguardi calls Ferrara to check on the day's progress and that it is Ferrara's job to provide information to Dioguardi regarding all of the gambling locations when he calls. This can be seen in the way Ferrara uses his phone to keep track of gambling activity. Four calls were recorded between the Ferrara telephone and Sarbens Furniture as well as one call recorded from the Mary Peters wireroom to the Ferrara phone. Ferrara received three other calls during this period from the telephone line and instrument currently assigned telephone number (212) 876-0431. I am informed by Bell Atlantic Telephone Company that this telephone number is subscribed in the name of Louis Sangenito and located at 333 East 116th Street, New York, the same address as the Mary Peters wireroom. These calls reveal the possibility of two wirerooms at 333 East 116th Street. There were no calls recorded between the Ferrara phone and the Christopher Colombo and Anthony Colombo home phones during this period. The fact that Dioguardi speaks frequently and consistently to both the Colombos and to Ferrara is consistent in my experience with organized gambling operations where the bosses of the operation do not speak directly to the individuals involved in the wireroom so that if the wireroom is found by law enforcement, the bosses will avoid detection.

58.     As late as August 1, 2000, surveillance showed that Dioguardi continued to meet Ferrara in the vicinity of 115th Street and First Avenue, Manhattan. On that date, at approximately 12:45 p.m., the surveillance team observed Dioguardi standing on the sidewalk in front of Mount Carmel Pizzeria, 345 East 115th Street, down the block from Ferrara's apartment and around the corner from the wireroom. Dioguardi was talking to Ferrara and two unidentified men. A 1998 blue Lincoln 4 door car, bearing New York license plate number X57-0FF was parked in front of the pizzeria. A computer check with the New York State Department of Motor Vehicles revealed that this car is registered to Carol A. Colombo, 25 Horton Road, Blooming Grove, New York, the home address of Anthony Colombo.

59.     I have been informed by Bell Atlantic Telephone Company that the telephone number to Mount Carmel Pizzeria located at 345 East 115th Street, County of New York, is (212) 996-4100. I obtained telephone toll records from January 1, 2000, through April 30, 2000, and discovered approximately 105 calls to the Pizzeria from the Ferrara telephone during that period. These calls were made on almost every day during this time and all occurred between the hours of 10:00 a.m., and 6:30 p.m. Pen register data reveal another sixteen calls to the pizzeria from Ferrara. Moreover, members of the investigative team have observed Christopher Colombo, Anthony Colombo, and Daniel Pagano at the pizzeria in the past. Based on the telephone activity and surveillance at the pizzeria, it is my opinion that Mount Carmel is a policy drop location and that Ferrara, in his role as accountant of the Colombo gambling operation, calls almost daily and sometimes twice a day, to find out the amount of money Mount Carmel has for him.

60. Telephone activity between Dioguardi and Joseph Colombo, Jr., has also continued during this period. There were five telephone calls recorded between Dioguardi's cell phone and the home telephone of Joseph Colombo, Jr., assigned telephone number (914) 496-3951. Five other telephone calls were recorded between Dioguardi's home phone and Joseph Colombo's home phone. Another three calls were placed to Joseph Colombo's cell phone, assigned telephone number (917) 846-6600, two from Dioguardi's home phone and one from his cell phone. Finally, an analysis of the Ferrara pen register data revealed that one call was recorded from Colombo's cell phone to the Ferrara phone during this period. This continuing telephone activity, as well as the single call between Joseph Colombo and John Ferrara reveals, in my opinion, that Joseph Colombo, Jr., is part of this gambling operation.

61. Telephone calls to other bookmaking and policy operations noted above, also continued during this period. For example, four calls were recorded between Christopher Colombo's home phone and the telephone line of Raymond Margulies. Another two calls were recorded between Christopher Colombo's home phone and the telephone line of Edward Robinson and five calls were recorded from Christopher Colombo's home phone to the Little Italy Delicatessen. One call was also recorded between Dioguardi's home telephone line and the Little Italy Delicatessen. Four calls were also recorded between Christopher Colombo's home telephone and Sarbens Furniture during this period. Six calls between Dioguardi's home telephone and Sarbens and two calls between Dioguardi's cell phone and Sarbens were also recorded. Six additional calls were recorded between Dioguardi's home telephone line and Russell Artuso.

62.     My analysis of the pen register data, as well as surveillance done during that time, reveal, in my opinion, that the gambling operation is ongoing and that the above-listed target telephones are being used to further the illegal gambling operation. An example of calls made over a period of hours on various days during this period illustrate this point. On July 12, for example, between approximately 12:13 p.m., and 5:30 p.m., the following occurred. At 12:13 p.m., Christopher called Dioguardi. He called Dioguardi again at 12:41 p.m. At 1:27 p.m., Christopher called the Little Italy Deli. Three hours later Ferrara called Mount Carmel Pizzeria. At 4:58 p.m., Dioguardi called Ferrara. Dioguardi called him back eight minutes later. Finally, at 5:30 p.m., Dioguardi called Anthony. This series of calls shows that each member of the organization has his own role and his own responsibility and that each one uses one of the target phones to carry out the gambling operation's business, namely Christopher and Dioguardi to determine the day's events early, Dioguardi to check the day's progress with Ferrara, Ferrara and Christopher to check other locations, and finally Dioguardi to brief Anthony on the day's events.

63.     Another example of this can be seen the following week. On July 19, 2000, at approximately 10:03 a.m., Dioguardi called Christopher. One hour later, Dioguardi called Christopher again. At 2:49 p.m., Dioguardi called Sarbens Furniture. A little less than one hour later, at 3:43 p.m., Ferrara called Mount Carmel Pizzeria. Six minutes later, Ferrara called Mount Carmel again. At 5:34 p.m., Dioguardi called Ferrara. Dioguardi then called Christopher five times. At 6:21 p.m., Ferrara called Sarbens Furniture. Minutes later, Christopher called Dioguardi. Twenty minutes later, Christopher called Anthony twice. At 9:10 p.m., Ferrara called Dioguardi. Seventeen minutes later, Christopher called

Anthony followed by Dioguardi who called Anthony twice. In my opinion, this series of telephone calls illustrates that Philip Dioguardi and Christopher Colombo spoke in the morning prior to the start of the gambling day to discuss the day's activities. In the afternoon, calls by Dioguardi to Sarbens and Ferrara to Mount Carmel aid the organization in determining its betting lines and its profits for the day. Christopher spoke to Dioguardi throughout the day to keep track of the gambling organization's progress. Dioguardi then checked with Ferrara before speaking to Anthony and relating the day's events.

64.     Surveillance teams have been able to observed Dioguardi's car in the driveway of both Anthony and Christopher Colombo's houses. The surveillance team cannot discern what the targets are discussing while the car is there. Moreover, the surveillance team has observed Dioguardi talk to Ferrara without being able to know what the conversation is about. They can observe Ferrara walk to and from his residence and watch Dioguardi enter and leave his house. None of this surveillance will enable the investigative team to understand what the subjects are doing. Moreover, attempts by the team to follow Dioguardi has resulted in having to call off the surveillance almost every time due to Dioguardi's driving habits. He continually drives at twenty miles per hour, even on the highway. He consistently makes U-turns and stops in the middle of streets, sometimes sitting still for thirty minutes straight. For these reasons, surveillance have been difficult.

65.     Moreover, it should be noted that Christopher Colombo lives on a rural street in a wooded area with no houses opposite or behind his and with the two neighboring houses far away. As such, conducting surveillance without being detected has

42

been extremely difficult as there is no place for the surveillance team to park and watch the goings on at the house or even on the street in front of the house. Surveillance at Anthony Colombo's house has also proven difficult. Anthony lives on the same street as Christopher but in a more developed area with houses to the left and front of the house. The area seems to be a "close-knit" neighborhood and surveillance teams have not been able to park cars nearby in order to view the house. In my opinion, any attempts to approach these residences for the purpose of conducting overhears would not succeed as the houses have land around them and neighbors who might see the surveillance teams and jeopardize the investigation. Even if we were able to conduct overhears at the residences, we would likely only hear one side of those telephonic conversations being engaged in by the targets, which conversations would not satisfy all of the objectives of this investigation as set forth in the annexed Affidavit of Assistant Deputy Attorney General Meryl Lutsky. Similarly, Dioguardi is on his cell phone all day and evening and spends the mornings with the Colombos. Surveillance on his home, therefore, would not further the investigation. Moreover, Ferrara lives in an apartment building. Surveillance teams could not stay in and about the hallways on the 3rd floor of a Manhattan apartment building without attracting attention and jeopardizing the investigation.

66.     Based upon all of the foregoing, there is probable cause to believe that Philip Dioguardi, Christopher Colombo, Anthony Colombo, and John Ferrara, their agents, co-conspirators and others as yet unknown, are committing the crimes of Promoting Gambling in the First and Second Degrees, Possession of Gambling Records in the First and Second Degrees and Conspiracy to commit those crimes, in violation of Articles 225

43

and 105 of the Penal Law of the State of New York. Moreover, there is probable cause to believe that Philip Dioguardi, Christopher Colombo, Anthony Colombo, John Ferrara, and their associates are involved in an illegal gambling operation and that the above-mentioned telephone lines and instruments are being used in furtherance of this operation.

67.     As set forth in the annexed affidavit of Assistant Deputy Attorney General Meryl Lutsky, the purpose of this investigation is not merely the apprehension of Philip Dioguardi, Christopher Colombo, Anthony Colombo, John Ferrara, and their associates for illegal gambling related activities. Instead, it is our objective to learn the full extent of the aforesaid illegal gambling activity and to develop sufficient evidence as to the roles, identities, whereabouts and participation of all members of the illegal bookmaking operation, and to successfully prosecute all those involved in that activity, including those who report gambling activities, lay-off wagers, tally monies gained from the gambling enterprise and money owed by the enterprise, and give and take instructions regarding the day to day operations of the gambling enterprise over the above-mentioned telephone lines, their superiors, and others associated with illegal bookmaking.

68.     Based upon the foregoing, it is reasonable to conclude that Philip Dioguardi, Christopher Colombo, Anthony Colombo, John Ferrara, and others are involved in illegal bookmaking activity and are using the above-mentioned telephone lines and instruments to conduct that activity. However, there is a vast amount of information I cannot learn and evidence I cannot gather unless court-authorized eavesdropping is used on these telephone lines and instruments. For example, I cannot learn the number of wirerooms reporting to Ferrara, Dioguardi, and the Colombos or the dollar amount of the

44

gambling operations being conducted at those wirerooms. Also, I cannot learn the number of wagers being accepted by these illegal wirerooms, nor can I learn the amount of bets layed-off by this gambling organization to other wirerooms. Similarly, I cannot learn what other partners or workers the Colombos, Dioguardi, or Ferrara may have and the dollar amount of the overall operation, unless we are able to intercept the calls of these individuals and learn the dollar amounts, number of wagers, and number of wirerooms that are involved in this gambling operation. Only by using court-authorized eavesdropping on the subject telephone lines, which are at the center of this illegal gambling operation, can we conclusively determine who all members of the operation might be, their roles in the operation, the scope of the operation or gather evidence against the participants.

69. Based upon my training and experience in gambling-related investigations, bookmakers often use electronic pagers in furtherance of their operation. It is important that bookmakers remain accessible to their clientele and therefore many bookmakers carry pagers/beepers. It should be noted that during my review of data generated by the pen registers and trap and trace devices attached to the subject telephone lines and instruments, I observed what appeared to be numerous pager numbers being called by the subject telephones. As such, we seek authorization to intercept certain electronic communications to digital pagers as they are dialed over the subject telephones.

70. Furthermore, thus far the use of conventional surveillance techniques has been unsuccessful in achieving all of the objectives of this investigation. As noted above, on numerous occasions, investigators have conducted surveillance of the

45

residences of Christopher and Anthony Colombo, as well as John Ferrara and Philip Dioguardi. However, these surveillance have only resulted in observations of Dioguardi's automobile parked at the residence of one of the Colombo brothers during the morning, and his meeting with Ferrara. Thus far, we have not been able to conduct "overhears" at any of the subject locations or at the originally identified wireroom which has since moved. As noted above, the new wireroom is also inaccessible as the building is made up of wirerooms and outsiders are not welcome. "Overhear" is a term which is used to describe when a member of law enforcement is able to physically position himself/herself outside of a target location in an attempt to "overhear" any conversations occurring inside of that location. In fact, any such attempts in the instant case may jeopardize this investigation. The Colombo residences are located in a rural area and, in my opinion, any attempts to conduct "overhears" would not be successful. As for Dioguardi, as noted above, he is never home so overhears at his house, if possible, would not further the investigation. Finally, overhears in a crowded apartment building are difficult at best and would probably not go un-noticed by neighbors. As well, for the reasons set forth in Assistant Deputy Attorney General Lutsky's affidavit, even though we have been able to conduct physical surveillance at the subject residences and in the vicinity of the wireroom, the surveillance alone are of limited utility in achieving all of the objectives of our investigation.

71.    Additionally, although a CI has provided information concerning the instant investigation and targets thereof, there is little more that can be accomplished by his/her information or actions. That is, the CI does not have knowledge or information relating to the full extent of this illegal gambling operation. I am further informed that,

46

because of the CI's fear of the targets of this investigation and to ensure the physical safety of the CI and the CI's family, the CI is not willing to testify against Philip Dioguardi, Christopher Colombo, Anthony Colombo, and John Ferrara, or any of their associates.

72.    I have been involved in numerous gambling investigations and based upon my experience and on the facts set forth in this affidavit, I believe that Philip Dioguardi, Christopher Colombo, Anthony Colombo, and John Ferrara, their agents, co-conspirators, and others as yet unknown, are engaged in an illegal bookmaking operation and that the above-captioned telephone lines and instrument have been, are being and are about to be used for illegal gambling. I know from my experience and training and from the facts set forth above that persons involved in bookmaking do so by accepting bets over the telephone. In my experience, any successful bookmaking operation depends upon the use of telephones not only to accept wagers, but to contact "hedge rooms" in order to "lay-off" bets, and   other locations to obtain the "lines," as well as to report activity to accountants, middlemen, and bosses of the gambling organization.

73.    In my opinion, a bookmaking operation cannot survive without the consistent use of telephones. Indeed, the information provided by the pen registers and trap and trace devices (Caller ID) attached to the above-captioned telephone lines and instruments, coupled with those other factors detailed above, has established probable

instruments.

INVESTIGATOR JOSEPH McCABE
New York State Police

**Sworn to before me this
8th day of August, 2000**

**Notary Public**

MARY A. MILLS
*... of New York*

Comm ...                    30, 2000

48